528 So.2d 255 (1988)
HARTFORD ACCIDENT & INDEMNITY COMPANY, George G. Williamson & Curtis E. Coker
v.
Mrs. Royce FOSTER, Administratrix of the Estate of Royce Foster, Deceased.
No. 56468.
Supreme Court of Mississippi.
April 6, 1988.
As corrected on Denial of Rehearing July 27, 1988.
*257 James L. Carroll, Virginia T. Munford, Watkins & Eager, Jerome B. Steen, Edward J. Currie, Jr., Steen, Reynolds, Dalehite & Currie, Joe H. Daniel, Daniel, Coker, Horton & Bell, Jackson, for appellants.
Douglas M. Magee, Mendenhall, for appellees.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
Hartford Accident and Indemnity Company, Curtis E. Coker, and George C. Williamson have appealed from a judgment in the circuit court of Simpson County in favor of Mrs. Royce Foster, administratrix of Royce Foster's estate, in the sum of $30,000. This was a suit instituted by Foster in his lifetime against the insurance carrier and his attorneys for bad faith refusal to settle a case within policy limits, and for breach of fiduciary duty owed by the attorneys to him.
This case requires us to address the duties owed by an insurance carrier to its insured when an offer is made to settle a liability claim within the policy limits, and also for the first time in this state, difficult questions pertaining to the duties of lawyers retained by the insurance carrier to represent the insured.
From a careful and meticulous study of this record, we have concluded the circuit court erred in refusing the defense motions to direct a verdict in favor of the defendants, and we therefore reverse the judgment and render judgment here for the appellants.
This holding requires that we affirm the cross-appeal of Foster's estate for pre-judgment interest and on the issue of punitive damages.

FACTS
Royce Foster owned and operated a family furniture store in Magee under the trade name "Foster Furniture Company." His son-in-law Donald G. Harris worked for him. On August 4, 1976, Harris, while driving a pick-up truck on a country road in Jefferson Davis County, making a furniture delivery, was involved in a motor vehicle accident with James L. Sims, who was driving a Chevrolet automobile. The vehicles were traveling in opposite directions when they collided, and Sims suffered severe injuries to his left arm. Harris is white, was a resident of Simpson County; Sims is black, was a resident of Jefferson Davis County.
On February 2, 1977, Sims filed suit in the circuit court of Simpson County against Foster, his son Royce Foster, II, and Harris, claiming $150,000 actual and $150,000 in punitive damages.
Foster had a liability insurance policy in effect with Hartford Accident & Indemnity Company with a maximum limit of $50,000 per person.[1] James L. Napper, claims *258 manager of Hartford in Mississippi, retained the Jackson law firm of Daniel, Coker, Horton, Bell and Dukes to represent the defendants in the lawsuit. On February 4, 1977, Napper wrote Foster Furniture Company (to the attention of Royce Foster) in Magee as follows:
I wish to advise you that the defense of this suit has been referred to the firm of Daniel, Coker, Horton, Bell & Dukes, Jackson, Mississippi. At some future date, a representative of this firm will be consulting with you on this matter.
(R. 1037)
The letter does not show that a copy was sent to the law firm. The policy manual for Hartford had a form letter to mail to insureds when a lawsuit exceeded policy limits. This form letter contains the following paragraph:
Since the amount of damages demanded is in excess of your policy limits, you may, if you wish, at your own expense, retain personal counsel to further protect your interests. We will be glad to cooperate with whomever you select.
Napper's letter to Foster did not contain this information.
Curtis E. Coker, a senior member of the firm, undertook the defense of the action. Coker in turn retained the services of George C. Williamson, a Mendenhall attorney, to assist in the defense of the case. An answer was filed on behalf of the defendants February 16 denying any negligence on the part of Harris, and affirmatively alleging that Sims, while driving at a high rate of speed, had failed to negotiate the curve, had crossed the center line of the road and side-swiped the truck.
Coker personally inspected the scene of the accident, and interviewed prospective witnesses, including the investigating officers and Harris and Foster. It was the belief and position of Harris and Foster that Harris was not negligent in the collision, but the sole cause of the accident was the negligence of Sims. The vehicles swiped one another on a graveled road. Coker and Williamson concluded there was no liability, and while a jury issue would probably be made, the defendants would win the case.

SIMS-FOSTER TRIAL
The trial testimony revealed that Harris was traveling south on a gravel road in Jefferson Davis County approximately two miles from Bassfield. The road was 17-18 feet wide within the shoulders. He was driving a 1976 Ford pick-up truck which had fitted on it a wooden frame or body to transport furniture. He was familiar with the road.
He approached a curve which turned sharply to his left. Foliage of roadside trees encroached upon the West, Harris's, side of the road. He testified he could not see around the curve, and was driving 12-20 miles per hour. He said he first saw Sims's automobile about three and one-half car lengths ahead coming into the curve meeting him, that he immediately applied his brakes, turned his wheels to the right and stopped. He also testified the Sims car was sliding all over the road, and the driver "seemed like" he had lost control. The Sims car struck the back of the pickup.
Sims was driving a 1966 Chevrolet automobile, with his three children in the car. His left arm was out the window, his left hand on top of the car. He testified it looked to him like the pick-up was driving down the middle of the road, and "Didn't look to me like he was trying to do nothing." He said the pick-up was cutting in on him. Sims said that he did not know what happened after the vehicles collided.
Sims had just left the residence of his brother-in-law Arthur Ray Michael, where he had stopped to inquire whether his wife was there. According to him:

*259 Well, I pulled off and just before I got to that curve, well, I was fixing to get in the curve, I look  I seen the dust coming and I blowed the whistle twice and I got around the curve, I never did see nothing.
Also:
Well, when I seen the dust I blowed and then I looked and that's when I seen the truck, but I thought he was going to, you know, going to get over, but he never did get over. I was as far as I could get over.
Harris said he was stopped at the time of the impact, but that the Sims car traveled another two hundred feet.
The left rear hub cap was knocked off the truck, and the wood frame was struck at the rear. As to the automobile, the extreme left side of the windshield was broken, the left frame holding the windshield was bent, and the side of the car at the rear of the left door was bent.
Gary Don Davis, constable, and Gary Jones, the chief deputy sheriff, respectively, of Jefferson Davis County, investigated the accident shortly after it occurred. Sims was still in his car. Jones said he could smell alcohol on Sims's breath. The officers checked the tracks of the vehicles, as well as debris from the pick-up frame in the road, which indicated the point of impact was about a foot and a half over onto the pick-up's side of the road. Davis also said the tracks indicated the rear of the Sims car was sliding at the time the vehicles collided, and that the back of the Harris truck was knocked about another foot and a half further over. Following the collision the two vehicles were about 300 feet apart.
Sims could not read or write, and was intermittently employed by two of his cousins hauling "paperwood." On the day of the accident he had been looking after the children while his wife Winnie worked. That morning he had driven about 30 miles distance to Hattiesburg, attended to some business about his home, and eaten a noon meal with a cousin. He bought a dollar's worth of gas and returned to his home. While back at his house, he said he had asked a neighbor, Lee Morris Knight, to help him scatter some dirt for his driveway. The two of them had a sixteen-ounce can of beer, each, according to Sims. Sims said he only drank about one-half of his. Knight was not called as a witness.
Sims said that over in the afternoon he asked Knight what time it was, who told him it was after four p.m. Sims knew his wife got off from work at 3:30 and he was supposed to pick her up.
He got in his car with the children and drove to Arthur Ray and Annie Pearl Michael's home where he expected to get his wife, but she was not there. He then drove off towards Bassfield. The curve in the road was about 300 yards from the Michael residence.
Harris testified that when the Michaels came to the scene just after the accident, Arthur Ray told him Sims had been drinking.
Michael testified that he and his wife heard the racket from the accident, that he ran from the house to the scene, and then the additional distance necessary to catch the Sims's still moving car. He said the pick-up was in the middle of the road. Michael admitted on cross-examination that he had been convicted of grand larceny.
At his pretrial deposition Harris had said that there were over-hanging bushes or trees just before the collision. At the time of his deposition he did not recall the truck coming in contact with any trees or bushes. At trial he testified the truck may have done so, he just did not recall whether it had or not.
At the conclusion of the trial, there was a jury verdict and judgment rendered for $80,000 in favor of Sims. Hartford, through Coker, offered Sims $50,000, the policy limits, in settlement of the case, which was refused. The defendants then appealed to this Court, and the case was affirmed without an opinion on November 22, 1978.
Foster was required to pay $30,000 plus a $100 letter of credit fee. All appeal costs, interest and penalty were paid by Hartford.
*260 On February 25, 1980, Foster filed a declaration in Simpson County against Hartford, Williamson and Coker. The declaration contained three counts. All counts alleged that the defendants in assuming exclusive control of the defense of the case had a duty to properly conduct litigation and settlement negotiations and consider the interest of Foster as well as Hartford, and to evaluate settlement offers from the joint perspective of Hartford and Foster, and to exercise good faith toward Foster and his interests. Foster further alleged that in failing to settle within the policy limits for $35,000 and then $30,000, they gave deliberate preference to Hartford and breached their duty to him. Count I also alleged a concealment of the $30,000 settlement offer.
Count II alleged that the conduct of the defendants constituted "wilful oppression and arbitrary action and so unreasonable as to constitute fraud," and was a "reckless disregard" of Foster's rights. Count III alleged that by rejection of the $30,000 settlement offer and other settlement offers within the policy limits, and by acting for "conflicting interest," the defendants became "strictly liable" for Foster's damages.
Foster sought actual damages of $920,000 plus punitive damages of $1,000,000.

FOSTER V. HARTFORD, COKER AND WILLIAMSON
As above noted, from their investigation of the accident scene and interviews with Harris and the law enforcement officers, Coker and Williamson were of the opinion there was no liability, although the plaintiff would probably be able to make a jury issue on whether Harris was negligent.
Counsel for Sims did not furnish any medical documentation until the Friday before trial date on Monday, September 12, 1977, when it was received by Coker's office. Coker, who was in Magee preparing for the trial, did not see the medical information until the day of the trial. Sims had suffered multiple fractures and his arm was permanently injured. At the time of trial he had undergone several operations on his arm, and had medical expenses of approximately $12,000, as well as a wage loss. Coker was aware prior to trial, however, from Sims's pretrial deposition that the injury to his arm was serious.
On the morning of the trial the circuit judge told the attorneys the case should be settled. Counsel for Sims then offered to settle for $45,000.
Coker first informed Foster of the settlement offer. Foster, while expressing the belief his son-in-law was not at fault, nevertheless told Coker he wanted to settle the case.
Coker responded that he would have to be honest with Hartford when he called about the settlement offer, that according to what Harris had consistently stated, there was no liability whatever, and Foster had told him Harris was a truthful person. Furthermore, the investigating officers would testify to physical facts at the scene that corroborated Harris's version. Coker then told Foster that if there was anything he could tell him in order that he could relate it to Hartford, to give it to him. Foster had no further factual information to give Coker.
Coker did not advise Foster to seek independent counsel when the offer of settlement was made. Coker's explanation was that he had advised Foster when he was retained he could hire his own counsel, "... but in regard to those offers, no, I didn't advise him because I don't know what it could possibly have accomplished."
Coker then called Napper, related the offer of settlement, and also Foster's expressed desire to settle. When he related the offer, he also told Napper he was concerned that Foster was under-insured and that if the settlement offer ever were reduced to $20,000-$25,000, even though he considered Harris was not liable, then "we might ought to consider it, but I didn't know what was going to happen." (R. 932) The settlement offer was rejected by Napper.
As trial progressed the plaintiff's demand was reduced to either $35,000 or $40,000, which likewise was rejected by Napper. *261 Coker testified he related these offers to Foster as well as Hartford. Foster denied he was told of any offers following the first offer to settle for $45,000. When the trial had been completed and the jury had retired to reach a verdict, the circuit judge again told counsel it was not too late to settle. Sims's attorneys then agreed to settle for $30,000.
When this offer was made, Coker and Williamson had a private conference about it. Just before their discussion Coker asked the circuit clerk, whose opinion he respected, what he thought the verdict might be. The clerk was of the opinion that the plaintiff would "get a goose egg." Foster was not present at the conference between Coker and Williamson.
It was the opinion of each attorney that the trial had gone well for the defense and that the odds overwhelmingly favored either a defense verdict or a modest plaintiff's verdict. Williamson felt that at the very most the jury would not render a verdict in excess of Sims' special damages, ranging from $2,000-$3,000 to at the most $15,000-$18,000.
Coker then telephoned Napper and told him of the offer, and related his and Williamson's view, but added that because Foster was under-insured, that if the plaintiff would take $25,000 they should offer it. Napper then rejected the $30,000 offer but authorized Coker to offer $25,000 in settlement.
Coker testified that he then made the counteroffer of $25,000 to Sims' counsel, who rejected it. The Sullivans, while recalling Coker's mentioning a possibility of getting $25,000 in settlement, one recalling his saying he would "recommend" it, did not recall Coker having made a positive counteroffer of $25,000. Both testified, however, that had he made a positive counteroffer it would have been promptly rejected. In any event, it is clear that neither made any affirmative response to Coker's mentioning of a possible $25,000 settlement.
Coker and Williamson both testified that following this final failure to effect a settlement, they both went over to Foster in the courtroom and related to him all that had transpired. Foster, on the other hand, positively denied having been told anything about the $30,000 offer and $25,000 counteroffer.
Coker testified that he never thought the plaintiff's case was worth $25,000 and the only reason he recommended it to Hartford was to remove from Foster the excess liability exposure. He repeatedly affirmed his strong confidence in his case until the jury verdict was returned. Coker said he considered that he was looking out after the interest of Foster and Harris.
Coker testified:
Q. Mr. Coker, before this leaves my mind, I want to ask you about a very recent question that was just asked you by Counsel. Counsel asked you whether or not you ever told Mr. Foster or Donald Harris that you were representing only The Hartford's interest in this prior lawsuit. My question to you is were you representing only The Hartford's interest in that lawsuit?
A. Absolutely not. Up through that trial, I was spending my efforts for them. As I said to begin with, Hartford hires me to defend their insured. The only thing they really ask of me is to be honest with them about my evaluations. And I had gone to the scene of the accident several times that I wouldn't have gone had they had plenty of insurance. It was their interest I was working at.
Q. Their interest being the Fosters and Mr. Harris?
A. Right.
Q. Was it their interest or The Hartford's interest that you considered when you recommended to Hartford that they pay $25,000.00?
A. Just theirs.
Q. The Fosters, you mean?
A. The Fosters. If they had had no insurance, I wouldn't have recommended it; and if they had had a million dollars, I wouldn't have recommended *262 it. The under insurance was the thing that concerned me.
(R. 989-990)
Coker's only concern with the case were the heavy medical expenses and the serious injury to Sims's arm. He did think the jury was "nondescript," and had no "businessmen" on it. Williamson, however, had confidence in the jury.
Coker felt it was his legal and ethical responsibility to give Hartford as fair and realistic an evaluation of the case as he could throughout, which he testified he attempted to do.
Williamson as a witness was more emphatic even than Coker that this was a case of no liability. He said if only Hartford had been exposed he would have recommended that nothing be offered in settlement. He also said Sims's testimony was incoherent, and that Sims was not owed anything as a result of the accident. As to the outcome of the trial, he testified, "This simply was a flout [sic] that happens. It had not happened before nor has it happened since in my experience as a lawyer." (R. 906)
Williamson also testified that prior to the Sims trial he had told Foster he could get another attorney to assist in the defense of the case.
Napper corroborated Coker's testimony about the settlement offer related to him. He said that following Coker's first call about the $45,000 offer he telephoned his superior, who authorized payment of $25,000 to settle the case if Napper and Coker thought it advisable. Napper also testified that Coker kept him apprised during trial including a $35,000 or $40,000 settlement offer.
As to Coker's call about the $30,000 offer, Napper related:
Right. He indicated that the  all the testimony had gone better than we could've expected it to, there were no surprises, the testimony was excellent, and in his opinion and Mr. Williamson's opinion that it was a case of no fault and that the jury would bring back a verdict for the Defendant, but because of the remote possibility of an excess judgment as to Mr. Foster, he recommended that we make an offer of $25,000 to settle the case; and I told him I would give him the $25,000, but I hoped they didn't take it. [Emphasis added]
(R. 1057-1058)
On April 23, 1982, Foster gave a pretrial discovery deposition. At that time he was 67 years old, retired, and had sold his business to Harris. Foster died on January 8, 1983, and the cause was revived by court order on September 6 in the name of his widow as administratrix.
In his deposition Foster recalled Coker telling him two or three times that he did not have enough insurance coverage, and he had known from the beginning that he was being sued in excess of his coverage. He said he could not deny Coker told him that he could retain another attorney. He remembered Coker telling him of the offer to settle for $45,000. His response upon hearing this was, "Well, that lets me out, Mr. Coker," and told Coker he was ready to settle, that it was just a matter of dollars and cents to him. He said that Coker told him his insurance company would not let him settle the case.
On his deposition Foster seemed to have a great deal of difficulty answering a number of questions, and memory problems. He testified that neither Coker nor Williamson told him about any further settlement offers after the $45,000 offer, and, as stated, he was positive that he was never told about the $30,000 offer.
Foster was unable to state in his own words the basis for the allegations in the declaration. It seemed to be his prime contention that since he was insured for $50,000 and since an offer of settlement was made within those limits, it was the duty of Hartford to go ahead and pay it in order to see that he was not damaged. This was despite the fact he remained convinced Harris had not been negligent in any manner in the accident. He also complained that he was not told of the $30,000 offer of settlement. He never stated that had he known of the Sims offer of $30,000 and Hartford's willingness to pay $25,000 *263 he would have been willing to pay the additional $5,000 to settle the case.
Foster admitted that after the circuit judge overruled the motion for a new trial he was unwilling to enter into any negotiations with the plaintiff whereby he might have paid something out of his own pocket and thereby settled the case. At one time Sims's lawyers offered to settle the case for an additional $20,000 over the policy limits, and Coker wrote Foster for authority to negotiate some settlement with them, expressing the hope he might persuade them to reduce the demand further. Foster did not give Coker any authority.
Foster also conceded in his deposition that he was never willing to pay anything towards settlement, that the "insurance company should have paid it." (R. 542)
Trial in this case was held March 27-29, 1984. Harris did not testify.
Following trial, after the court overruled defense motions for directed verdicts, the jury returned a verdict in favor of Foster's estate against the defendants for $30,000. Hartford, Coker and Williamson have appealed. Foster's estate has cross-appealed the refusal of the circuit court to permit the issue of punitive damages to be submitted to the jury, and refusal to allow pre-judgment interest.

HARTFORD APPEAL
Hartford first argues that under the facts of this case it was under no contractual duty to Foster to accept any of the compromise offers of settlement. To answer this we must determine and define the duties of an insurance carrier when there are offers to settle a case within policy limits.
While Hartford's policy contained the standard provision giving it the absolute right to defend an action against the insured, and to make whatever settlement it deemed expedient, it is now well settled that this very power created an obligation on the part of Hartford, akin to a fiduciary duty, to "consider fairly the interests of the insured as well as its own." Vol. 7C Appleman (Berdal Rev.), § 4711, p. 371; Rova Farms Resort, Inc. v. Investors Ins. of America, 65 N.J. 474, 492, 323 A.2d 495, 505 (1974).[2]Merritt v. Reserve Ins. Co., 110 Cal. Rptr. 511, 34 Cal. App.3d 858 (1974), contains thoughtful statements of the reciprocal duties of the insured and his carrier:
Thus, when a settlement within policy limits is offered by claimant, the previously parallel interests of assured and carrier diverge, and a conflict of interest arises, for while it is invariably to the assured's financial interest to settle within policy limits, settlement is only to the carrier's financial interest when the relationship between settlement offer and policy limits is mathematically favorable in the light of the probabilities of winning or losing the suit.
* * * * * *
[A]nd whenever a conflict of interest breaks out the carrier becomes obligated to protect the interests of the assured equally. with its own.
110 Cal. Rptr. at 518-519, 34 Cal. App.3d at 869-870.
*264 Quoting from a previous decision, Communale v. Traders & General Ins. Co., 50 Cal.2d 654, 328 P.2d 198 (1958), the Court held that since the insurer has reserved control over the litigation and settlement, it is liable for the entire amount of a judgment against the insured in excess of the policy limits, "... if in the exercise of such control it is guilty of bad faith in refusing a settlement." 110 Cal. Rptr. at 520, 34 Cal. App.3d at 871.
One test for determining whether the carrier has given good faith consideration to the interests of the assured, "... is whether a prudent carrier on a policy of unlimited liability would have accepted the settlement offer."
Further, quoting from another previous decision, Brown v. Guarantee Ins Co., 155 Cal. App.2d 679, 319 P.2d 69 (1957), the Court stated:
The obligation of the insurer should not be extended beyond the duty of exercising good faith in the conduct of the matters arising from that relationship... If the insurer has exercised good faith in all of its dealings under its policy, and if the settlement which it has rejected has been fully and fairly considered and has been based upon an honest belief that the insurer could defeat the action or keep any possible judgment within the limits of the policy, and its judgments are based on a fair review of the evidence after reasonable diligence in ascertaining the facts, and upon sound legal advice, a court should not subject the insurer to further liability if it ultimately turns out that its judgment is a mistaken judgment.
110 Cal. Rptr. at 520, 34 Cal. App.3d at 872. Further, the Court held, the carrier's decision "must be honest, intelligent and knowledgeable." 110 Cal. Rptr. at 521, 34 Cal. App.3d at 873. And, "The duty of good faith thus imposed upon the carrier is one peculiar to this situation." 110 Cal. Rptr. at 521, 34 Cal. App.3d at 874.
In summary that Court stated:
When a claimant offers to settle an excess claim within policy limits a conflict of interest immediately arises between the carrier and assured. In such circumstances the carrier is required to evaluate the settlement offer in good faith, and good faith requires it to consider the interests of the assured equally with its own, or as some of the cases have said, to evaluate the settlement offer as though the carrier itself were liable for the full amount of the claim. If the carrier rejects the offer to settle within policy limits without having made an honest, intelligent and knowledgeable evaluation of the offer on its merits, then the carrier has acted in bad faith and may become liable to its assured for consequential damages caused by its bad faith rejection.
110 Cal. Rptr. at 521, 34 Cal. App.3d at 873. Also, Northwestern Mutual Ins. Co. v. Farmers Ins. Group, 76 Cal. App.3d 1031, 1040-1042, 143 Cal. Rptr. 415, 420-21 (1978); Twentieth Century Fox Film Corp. v. Harbor Ins. Co., 85 Cal. App.3d 105, 111-112, 149 Cal. Rptr. 313, 317 (1978); Crisci v. Security Ins. Co. of New Haven, Conn., 58 Cal. Rptr. 13, 66 Cal.2d 425, 426 P.2d 173 (1967); Betts v. Allstate Ins. Co., 154 Cal. App.3d 688, 201 Cal. Rptr. 528 (1984).
Sargent v. Johnson, 551 F.2d 221 (8th Cir.1977), applying Minnesota law, held:
Where a claim is made against an insured which may exceed policy limits, and where the insured and insurer may each incur liability, then each assumes an obligation to act in good faith, to face the facts realistically, and to maintain a mutual respect for the interests of the other.
Id. at 231.
In Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 419 A.2d 417 (1980), the New Jersey Supreme Court, citing Appleman, § 4687, held:
While the insurer is not compelled to disregard its own interests in representing or defending an insured, the insured's interests must necessarily come first.
84 N.J. at 336, 419 A.2d at 422-23.
Cousins v. State Farm Mutual Auto. Ins. Co., 294 So.2d 272, 275 (La. App. 1974) held:

*265 Our own jurisprudence accords with the majority view that the insurer is the champion of the insured's interests; that the interests of the insured are paramount to those of the insurer, and that the insurer may not gamble with the funds and resources of its policyholders.
* * * * * *
As regards compromise, our jurisprudence is to the effect that an insurer is not required to settle a claim within policy limits under penalty of absolute liability for any excess judgment rendered against the insured. Nevertheless, an insurer may be liable for an excess judgment against its insured where the insurer's refusal to settle within policy limits is found to be arbitrary or in bad faith.
* * * * * *
It appears that, in determining liability of an insurer to its insured for either an inadequate defense or refusal to accept a compromise offer, the courts are divided on the issue of whether liability is predicated upon negligence or breach of good faith owed the insured. Although the terms "negligence" and "good faith" are frequently used as either disjunctive or alternative tests, virtually all authorities consider the following factors in determining liability of an insurer for either failure to defend or failure to compromise: (1) The probability of the insured's liability; (2) the adequacy of the insurer's investigation of the claim; (3) the extent of damages recoverable in excess of policy coverage; (4) rejection of offers in settlement after trial; (5) the extent of the insured's exposure as compared to that of the insurer, and (6) the nondisclosure of relevant factors by the insured or insurer.
Also, see Champion v. Farm Bureau Ins. Co., 352 So.2d 737, (La. App. 1977); Shelton v. Commercial Union Ins. Co., 396 So.2d 1379 (La. App. 1981).
Appleman, § 4712, pp. 425-426, summarizes the insurer's obligation:
[S]ome courts, in weighing the responsibilities of the liability insurer, speak of bad faith; some speak of negligence; others use the two terms interchangeably. And, in truth, they are to some extent interchangeable. The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in one instance may be unforgivable oversight of the insurer; what might be neglect in one instance could well constitute bad faith on the part of the insurer. The question is always: "Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?" If it did, there is no problem; it is not liable. If it did not, then a court could easily describe its conduct as being negligent, or as not in accordance with the high duty of good faith which it owed to its insured. And the insured, having surrendered to the insurer the exclusive control over these matters which impinge so closely upon his future welfare and financial well-being, is entitled to expect that skill, that judgment, and that consideration ...
We adopt the prevailing view as above set forth that when suit covered by a liability insurance policy is for a sum in excess of the policy limits, and an offer of settlement is made within the policy limits, the insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own, and also to make a knowledgeable, honest and intelligent evaluation of the claim commensurate with its ability to do so. If the carrier fails to do this, then it is liable to the insured for all damages occasioned thereby.[3]
*266 The burden of proving bad faith is upon the insured. Appleman, supra, § 4712, p. 499, Hartford Acc. & Indemn. Co. v. Cosby, 277 Ala. 596, 173 So.2d 585 (1965); Roberie v. Southern Farm Bureau Cas. Ins. Co., 185 So.2d 619 (La. App. 1966), writ refused 249 La. 476, 187 So.2d 447, writ granted 249 La. 483, 187 So.2d 450 (1966), reversed on other grounds 250 LA. 105, 194 So.2d 713 (1967).
Where evidence is produced either of bad faith or negligence, ordinarily the issue becomes a jury question. Appleman, § 4712, supra, p. 440; § 4713, p. 518. No precise formula can be prescribed for determining the sufficiency of the evidence. Millbank Mutual Ins. Co. v. Schmidt, 304 F.2d 640 (8th Cir.1962).

HARTFORD'S DUTY TO SETTLE THIS CASE
Very little sympathy can be felt for an insurance carrier which finds itself as Hartford does in this case. Hartford's local agent either knew, or certainly should have known, that Foster needed more coverage than what he had. Yet there is nothing in this record to suggest that prior to the accident there was any inclination whatever to advise Foster on his needs, and the coverage Hartford had available. Had either Hartford or its local agent exercised any such responsibility, they would have at least advised Foster that his insurance coverage was inadequate. It is equally well-known that the difference in premium between a minimum and a much greater coverage is modest. Any insurance company which permits its local agents to indiscriminately sell liability coverage with no effort whatever to inform its insured of all the coverage it offers should have this factor weighed in any subsequent bad faith lawsuit resulting from inadequate coverage.
The fact remains that there is nothing in this case supporting bad faith on the part of Hartford's decision not to accept the offer of settlement. There can be no negligence or bad faith attributed to Hartford's assessment of the settlement value of this case. Hartford made a realistic evaluation.[4] The only asset of Sims's case was the dreadful injury to his arm. No insurance company should be faulted, however, regardless of the plaintiff's injuries, for not paying a claim when it has every reason to believe its insured was not at fault. In so doing it may upon occasion lose (as Hartford did here), but this is a far more salutary practice than encouraging insurance companies to pay off every dubious claim in which the injuries happen to be serious. Of course, a serious question of liability coupled with serious injuries is an entirely different matter. This certainly is not this case.
The first offer to settle before the trial started was for $45,000, which was reduced to $40,000-$35,000, and finally to $30,000. This indicated both that Hartford's assessment was realistic, and that the trial had gone well for the defendants.
The attorneys did not think the case was worth the $25,000 in settlement, and solely as a precaution against what to them was a remote possibility that the verdict might exceed policy limits, recommended this sum. The highest figure Williamson thought the jury would ever give was $15,000-$18,000. The circuit clerk thought it would be a verdict for the defendants.[5]
Also is the fact that Hartford stood to lose by refusing the settlement offer, just as Foster did. This was not an offer to settle for the policy limits. Hartford did lose an additional $20,000 by not accepting the final offer. Foster lost $30,000. Also, Hartford paid all appeal costs, penalty and interest on the entire judgment, which would suggest that ultimately Hartford and Foster each were damaged in approximately the same sum by Hartford's not accepting the $30,000 offer.
*267 It is likewise significant to us that Harris, whose testimony in the first trial showed he was not negligent, did not testify in this trial, thus indicating that he had no quarrel with Hartford's assessment.
Finally, the fact that Hartford, following the final judgment, promptly offered to pay the policy limits, was evidence of good faith on its part in trying to protect Foster. Cousins v. State Farm, supra, 294 So.2d at 275; Fertitta v. Allstate Ins. Co., 439 So.2d 531 (La. App. 1983), clarified, motion denied 441 So.2d 1250 (La. App. 1983), affirmed 462 So.2d 159; Samson v. Transamerica Ins. Co., 30 Cal.3d 220, 178 Cal. Rptr. 343, 636 P.2d 32 (1981).
There have been many decisions in which insurance companies have been held liable for bad faith refusal to settle. 40 A.L.R.2d 168-264, Later Service, 1980 (Supp. 1986). Also, cases cited in 7 Am.Jur.2d Automobile Insurance, §§ 383-388; and Appleman, supra, §§ 4712-4713. There is no need for further examination of such decisions than we have made, however, because no criterion supports a holding in this case that Hartford acted negligently or in bad faith in its assessment value of the case. Moskau v. Insurance Co. of North America, 366 So.2d 1004 (La. App. 1978); Tank v. State Farm Fire Cas. Co., 38 Wash. App. 438, 686 P.2d 1127 (1984).

COKER, WILLIAMSON AND HARTFORD
While no bad faith can be attributed to Hartford in its refusal to accept the offer of settlement based upon its assessment of Sims's lawsuit, our inquiry cannot end here.
The next, and more difficult question is whether Coker and Williamson by a breach of fiduciary duty to Foster gave him a cause of action against Hartford as well as the attorneys.
Hartford contends that even if Coker and Williamson breached their duty to Foster, as attorneys they were independent contractors and their bad faith, if any, was not imputable to Hartford. In Merritt v. Reserve, supra, 110 Cal. Rptr. 511, the California court of appeals held that the insurance carrier was not liable for the negligence of trial counsel in defense of the suit. We do not have this question here. Coker and Williamson are not charged with any negligent defense of the Sims case.
The question here is whether Hartford is liable for a breach of fiduciary duty, if any, on the part of Coker and Williamson of which Hartford was the intended beneficiary. Although Coker and Williamson were attorneys for Foster as well as Hartford, it must be recalled that Hartford had the exclusive right to employ counsel and conduct the defense. At least to the extent of any charge of bad faith by attorneys, we prefer the holding of Smoot v. State Farm Mutual Auto. Ins. Co., 299 F.2d 525 (5th Cir.1962). In that case the insured instituted a suit against his carrier for both negligent and bad faith conduct of his defense by the attorney for the carrier. In holding the carrier liable for any negligent as well as bad faith conduct by the attorneys, the Court of Appeals stated:
Another basic contention of the Insurer should likewise be put to rest. In spite of the outright promise to "defend any suit against the insured alleging such injury * * * even if such suit is groundless, false or fraudulent * *," the Insurer now insists that it has no responsibility for damage sustained by the Assured even if it should be caused by legally culpable neglect or bad faith on the part of the attorney supplied by it to maintain the defense. In other words, the Insurer asserts that its duty is fulfilled by selecting competent counsel whose acts thereafter are that of one akin to an independent contractor. The cases urged by the Insurer do not support any such view. The duty to defend is an important and frequently distinguishable part of the insurance contract. American Fidelity & Casualty Co. v. Pennsylvania Threshermen, 5 Cir., 1960, 280 F.2d 453. Those whom the Insurer selects to execute its promises, whether attorneys, physicians, no less than company-employed adjusters, are its agents for whom it has the customary legal liability.
299 F.2d at 530.
We are not called upon to address in this case the question of whether negligent *268 conduct of a trial by a defense attorney, which harmed the carrier as well as the insured, is imputable to the carrier in a subsequent malpractice or bad faith suit by the insured against the carrier. We have no difficulty in holding that where an insurance carrier has employed the defense counsel, who faced with a conflict of interest between the insured and the carrier, breaches his fiduciary duty to the insured by favoring the carrier, the carrier is legally liable along with the attorney for any ensuing damage to the insured. Also: Nat'l Farmers Union Property & Cas. Co. v. O'Daniel, 329 F.2d 60, 65 (9th Cir.1964); Petersen v. Farmers Cas. Co., 226 N.W.2d 226 (Iowa 1975); Evans v. Steinberg, 40 Wash. App. 585, 699 P.2d 797 (1985); 7C Appleman, § 4687.

THE ATTORNEY'S DUTY
We now turn to the difficult questions and serious ethical problems which must be faced by an attorney employed by an insurance carrier to represent the insured. There can be no question but that the lawyer owes his client absolute loyalty, and is required to devote his professional ability solely in the interest of that client.
The fact that the insurance contract authorizes the insurance company to employ an attorney to handle the defense of a case in no way impairs or diminishes the duty of the lawyer to the insured client. See: Mallen, "Insurance Counsel," 45 Insurance Counsel 244 (1978), p. 245 and cases cited, Footnotes 7-11. A contract which authorized any dilution of the ethical obligation of an attorney to the client would be void as against public policy.
There is nothing wrong with a lawyer representing two clients in the same cause of action so long as the interests of the clients in that cause parallel each other. Where the objectives of the clients are adverse to one another, however, the attorney will almost certainly be faced with a conflict of interest problem. Conflict of interest occurs when a person charged with looking after the interest of A and B is faced with an option whereby if he makes one choice it will of necessity hurt A and help B, and if he makes the other choice he will of necessity help A and hurt B. Pearl River Valley Water Supply v. Hinds County, 445 So.2d 1330, 1356, note 25 (Miss. 1984).
Where the interests of the two parties are in some manner antagonistic to one another, before any lawyer is authorized to assume dual representation (or continue if the adversity appears after he has been retained), he must first satisfy himself that there is no objective reason why he cannot, despite such divergence of interest, faithfully represent them both. If this cannot be met, the lawyer should not accept employment in the first place (or terminate it, if begun). Secondly, even if the lawyer reasonably (and from an objective point of view) believes he can faithfully represent dual parties with adverse interests, he still must fully explain all implications of the advantages as well as the risks of his representation to both parties, and assure himself that they both have given knowing and informed consent. Rule 1.7 Conflict of Interest: General Rule, Mississippi Code of Professional Conduct, and Comment thereunder.[6]
*269 Although a lawyer may ethically in some circumstances, and with his client's consent, limit the objectives of his representation, Rule 1.2 Scope of Representation, par. (c),[7] this can never authorize the attorney to engage in dual legal representation entailing professional decisions on his part which stand to benefit one client at the expense of the other. Rule 1.7, supra.[8]
Any lawyer who attempts to represent two adverse masters places himself in a precarious, perilous position.
These Professional Code statements are distilled principles of ancient, time-honored, and judicially-enforced conduct on the part of lawyers in representing clients. Without them our system of justice would be doomed.
A liability insurance policy undertakes to insure a person up to a specified sum of money caused by his negligence. The policy requires the company to defend any lawsuit charging negligence, and also authorizes the company to select the attorney and conduct the defense of the action. The insured is required to fully cooperate with the company in undertaking the defense. Because the company is footing the bill for the defense, and will be obligated to pay any judgment rendered (if it does not settle the case), it is clearly entitled to select the attorney and conduct the defense. This does not, and indeed could not, authorize the company to undertake or pursue any defense prejudicial to the monetary interest of the insured. It hardly needs to be added that no insurance policy can validly diminish a lawyer's duty to his insured client. See: Allstate Ins. Co. v. Keller, 17 Ill. App.2d 44, 149 N.E.2d 482 (1958); Fidelity and Cas. Co. of N.U. v. McConnaughy, 228 Md. 1, 179 A.2d 117 (1962).
The insurance company's selected lawyer is rarely employed until a lawsuit has been filed. Generally speaking, it will be a firm with many years experience defending such types of action. If the damages claimed are within the policy limits, and there is no question of coverage, no potential problem to the lawyer exists.
When there is a demand in excess of the policy limits, however, it is the customary practice of the insurance company to notify the insured of such demand, and that he consider employing his own attorney to protect his individual interest. Mallen, Insurance Counsel, 45 Insurance Counsel Journal, 244, 260 (1977); Mallen and Levitt, Legal Malpractice, (2nd Ed.), # 539, p. 661; also, Hartford's Manual, supra. The prudent defense lawyer will assure himself the insured has indeed been notified of his potential need for independent counseling.
Yet, a damage claim beyond policy limits in and of itself presents no ethical problem to the lawyer employed to defend the case, because his employment is for one of two purposes: either win the case outright, or keep the damages as low as possible. Everything he does in fulfillment of either objective must of necessity benefit both clients. See: Merritt v. Reserve Insurance Co., 34 Cal. App.3d 858, 868, 110 Cal. Rptr. 511 (1973). The lawsuit must be defended *270 forthwith, professional decisions and actions must be timely made.
When there is a question of coverage, however, and the insurance company notifies the insured that it will fulfill its obligation to defend the suit, while at the same time reserving a right to deny coverage of the insured's conduct, the insurance company-employed defense lawyer is presented with an ethical question up front. Also, in the course of preparation for trial or his representation, if there develop facts which may exclude coverage, leaving his insured client high and dry, he is again presented with an ethical dilemma. The lawyer may be required to withdraw from the case altogether, or restricted in his continuing representation with the insurance company furnishing at its expense an independent counsel chosen by the insured to represent his own interests. When any such situation is presented or arises, it is the professional and ethical obligation of the lawyer to recognize it, and take the appropriate action to see that the interests of both clients are preserved. He certainly is prohibited from taking any action which may injure either client. This is basic to the duties of any attorney representing clients in litigation.[9]

OFFER TO SETTLE CONFLICT
A plaintiff's offer to settle within the policy limits presents a different conflict of interest problem to the defense lawyer. His clients' previously parallel interests then clearly diverge. This moment calls for a halt, and a decision must be made by his two clients, to settle or not to settle. The lawyer's own professional problem depends upon the course of action he then takes. If the offer is accepted, the insured cannot be monetarily harmed because he will not have to pay anything. The company may or may not stand to lose, depending upon the merit and magnitude of the claim. Until the attorney receives the offer of settlement, his entire activity has been devoted towards winning the case or minimizing the damages. Now he must ask the court and opposing counsel for "time out," for a decision to be made by his clients on this offer.
His first professional and ethical obligation is to see that both their interests are protected insofar as he can do so, and that he does nothing to harm either. The insured and the carrier are both clients: Lieberman v. Employers Ins. of Wausau, supra; American Mut. Liability Ins. Co. v. Superior Court, 38 Cal. App.3d 579, 591-92, 113 Cal. Rptr. 561, 571 (1974); Purdy v. Pacific Auto. Ins. Co., 157 Cal. App.3d 59, 203 Cal. Rptr. 524 (1984). Thus, the first thing he should do is to attempt to halt trial proceedings so that no trial development will harm either until a decision on the settlement offer has been made by his clients.
His next obligation is to fully inform each client the terms of the settlement offer. Cousins v. State Farm Mut. Auto. Ins. Co., supra, 294 So.2d at 275; Rogers v. Robson, Masters, Ryan, Brumund & Belom, 74 Ill. App.3d 467, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979); Hamilton v. State Farm Mut. Auto. Ins. Co., 9 Wash. App. 180, 511 P.2d 1020 (1973), aff'd 83 Wash.2d 787, 523 P.2d 193 (1974); Yeomans v. Allstate Ins. Co., 130 N.J. Super. 48, 324 A.2d 906 (1974); Lysick v. Walcom, 258 Cal. App.2d 136, 65 Cal. Rptr. 406 (1968); Ivy Pacific Auto. Ins. Co., 156 Cal. App.2d 652, 320 P.2d 140 (1958); American Cas. Co. of Reading, Pa. v. Glorfield, 216 F.2d 250 (9th Cir.1954), applying Washington law; Betts v. Allstate Ins. Co., 154 Cal. App.3d 688, 717, 201 Cal. Rptr. 528, 545 (1984).
But following this, what should the attorney say to his clients?
Unfortunately for the defense counsel, following an offer of settlement within policy limits he now has superimposed upon his ethical proscription against simultaneously serving two adverse master two other canons of professional ethics.
Rule 1.4 of the Mississippi Rules of Professional Conduct states:
Rule 1.4 Communication.

*271 (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
The comment under this rule makes it clear the rule requires the attorney to fully explain to his client all the ramifications of any offer of settlement.
Also, there is Rule 2.1:
Rule 2.1 Advisor.
In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.
The comment under this rule makes it clear that the lawyer must give completely honest and straightforward advice to his client, even though unpalatable, at all stages of his legal representation. This obviously would include the duty to be open and candid about any settlement offer. Also: Hamilton v. State Farm Auto. Ins. Co., supra.
Should defense counsel be forbidden to give his clients what he sincerely believes is an honest assessment of the case? If an offer has been made to settle for the policy limits, and he advises the company to settle, he has most certainly helped the insured, but he may have harmed the carrier, which has nothing to gain by accepting the offer, and the case could be worth much less. On the other hand, if he advises the company to refuse, he most certainly is placing the insured at some risk.
Yet what should defense counsel do? To say nothing is to deprive his clients of what could be extremely important advice.
Even more disturbing to the conscientious attorney faced with such a situation will be a concern that in any recommendation he subconsciously may be favoring one client at another's expense, because his loyalty is then divided.
Mallen and Levitt, Legal Malpractice, (2d Ed.), § 539, contains two sentences. On page 664, we read:
The obligation of loyalty requires the attorney to secure and utilize necessary settlement authority and to obtain the insured's consent for any settlement which affects his rights.
Page 665 contains the following sentence:
Defense counsel's obligations to the insured may require that he actively seek funds from the insurer to attempt settlement of a case of serious liability which portends an excess exposure.[10]
Neither of the above sentences cites case authority. It is difficult to gather precisely what the authors mean. As to the latter sentences, a defense counsel recognizing a serious case of liability and danger of excess exposure may very well have an affirmative duty to call it to the carrier's attention. We are not called upon to address this question in this case. As to the first sentence, if it is meant that the moment the insured demands acceptance of an offer within policy limits it is the duty of the attorney to call upon the carrier to ante up, it takes little exploring to realize that this will not work out in actual practice. Lawyers employed to defend motor vehicle cases generally are specialists who have for many years depended upon the insurance industry for their livelihood. To suggest that they forget the client who employs them and affords them a living in favor of an isolated client they may never *272 again represent, or even see, has only an idealistic image to support it. Purdy v. Pacific Auto. Ins. Co., supra, 203 Cal. Rptr. at 534-535, holds that failure by the defense attorney to advise the carrier client to settle a case did not give the insured client a cause of action against him, even though the carrier was itself liable for wrongful refusal to settle.
To make it the ethical duty of such attorney to ignore his obligation to the carrier, and urge or advise a settlement which he views is against its interest would place a greater burden on the attorney than this Court cares to impose.
Furthermore, it is the attorney's ethical obligation to have undiluted loyalty to both clients. It is just as repugnant ethically to ask him to ignore the interest of his insurance carrier client as it would be the other way around.
The case of National Farmers Union Property & Cas. Co. v. O'Daniel, supra, at 66, states that the duty of an attorney when such an offer of settlement has been made and the insured demands settlement is to withdraw from the case. Although that may have been proper under the facts of that case, and there may be cases where this would be necessary, we likewise reject this as the solution to the problem.[11] It is a matter of utmost gravity to suggest that because of an ancillary dispute between clients on whether or not to settle, and having nothing to do with the trial of the case, that both clients should be deprived of who may very well be the best lawyer available to defend their interests.
Professor Keeton in his Harvard Law Review treatise, written more than thirty years ago, footnote 2, supra, anticipated many of the problems since encountered by carrier-employed attorneys. 67 Harvard Law Review 1167-71. Recognizing the delicacy and difficulty of the problem, he suggested that, with full disclosure, it should be permissible for the attorney to represent only the company with respect to any settlement offers. Indeed, it was his view that the primary obligation of the defense attorney was to represent the insured in defense of the claim, but that as to a settlement, the attorney's obligation was to the carrier.
We must disagree that in such a settlement offer the attorney's obligation in the ordinary case would be to the carrier. Furthermore, full initial disclosure of the prospect that in event of a settlement offer the attorney proposes to represent only the carrier may create problems as well. The insured client should not have to worry that his lawyer, who owes him complete loyalty, may on an offer of settlement forsake his insured client and look solely after the carrier's interests.
In Vol. 28, Insurance Company Counsel, July, 1961, A "Ancillary Rights of the Insured Against His Liability Insurer," pp. 412-413, Professor Keeton, while again suggesting that the attorney might with full disclosure represent only the carrier's interest in a settlement offer, also might, as respect to a settlement, represent neither the carrier nor the insured. We are persuaded the latter is preferable, and that in an offer of settlement the attorney should not attempt to represent either.
Tacit in any employment by the carrier of an attorney to defend the insured should be the understanding that the attorney has a duty to make full disclosure to the insured all areas of possible conflicts of interest. It may very well be prudent on the part of the attorney, after he has made some investigation and evaluation of the case, to consider the necessity of advising his insured client well in advance that in event of a settlement offer within policy limits, he will not be able to represent him, and that this will be a matter between him and the carrier. If there is a settlement offer made, our view is that the attorney, *273 after accurately informing each client of its terms, should advise the insured that he cannot offer him any legal advice as to the offer other than it is obviously to his monetary advantage that the offer be accepted, and that he should promptly inform the carrier what he wants the carrier to do regarding the offer.[12] If there is any objective reason for the insured to have additional legal counseling, defense counsel should promptly advise him to go and seek it. Any doubt on this question should be resolved in favor of recommending independent advice. See: Comment, Rule 1.7, MRPC. The prudent attorney, recognizing that the unsophisticated insured has a more acute need for independent counsel than the carrier, will want him to have it.
All this being said, however, as to the insurance counsel's duty, it must also be noted that an independent counsel's role is extremely limited, and may be superfluous in this unique conflict of interest situation. Here is why.
When an offer to settle within the policy limits is made, the carrier has three options: accept, reject, or reject with a counter-offer. What options does the insured have? None. He can ask the company to settle, or ask it not to settle. He can do no more. Because his choice is limited to what he is going to request of the insurance carrier regarding this settlement offer, the usefulness of an independent counsel is likewise limited. On behalf of the insured, the lawyer can demand settlement. He may also be of some benefit persuading an insured who, for one reason or another does not want to settle, footnote 12, supra, that it is in his best interest to demand settlement by the carrier.
In any event it can be seen that the insured may not have suffered any loss by failing to consult independent counsel, if the only service such lawyer could give would be to demand the company to settle.
As to the carrier, the attorney should make it clear that the company is presented with a conflict of interest, and has a legal duty to carefully protect the interest of the insured to the same extent as its own. Beyond this, he may very well have an ethical obligation to refrain from any recommendation, especially if his recommendation places his insured client in peril.
In sum, the ethical dilemma thus imposed upon the carrier-employed defense attorney would tax Socrates, and no decision or authority we have studied furnishes a completely satisfactory answer. We would first observe that it is of the utmost importance that the lawyer promptly recognize the difficult problem which faces him, and which requires the most carefully measured words. The best this Court can offer is that the attorney, after informing his clients of the settlement terms, and giving them the advice as above noted, should not be prohibited from honestly and carefully answering questions pertaining to the law and facts of the case, his impressions of the witnesses, the jury, and the trial judge, such as he would normally be asked as attorney, and expected to be able to answer. At the same time he must scrupulously guard against violating his absolute, nondelegable responsibility not to urge, recommend or suggest any course of action to the carrier which violates his conflict of interest obligation. This is a tortuous, perilous path.

WHAT HAPPENED HERE
There are four points in time when special care was required of Coker and Williamson to see that Foster's interest was served.
First, when Coker and Williamson were employed it was their responsibility to be sure that Foster was notified he was being sued in excess of his policy limits, clearly signal to him his personal liability danger, and that he should consider employing *274 his own attorney if he cared to do so. Magarick, Excess Liability, (1982), § 15.03.
Generally, the insurance company by its first letter to the insured following filing of a suit has already done this. Napper failed to do so for some reason.
Coker and Williamson both testified positively that they did inform Foster he was being sued in excess of his policy limits and to consider employing his own attorney, and that he could do so if he chose. Foster did not deny this.
In any event we need not tarry here because Foster never made any claim either in his declaration or at trial that Hartford or the attorneys had breached their duty by not informing him to consider consulting with or employing independent counsel.
The next juncture was when the plaintiff offered to settle for $45,000. The attorneys' duty then was to inform Foster of the offer, as well as Hartford. It is undisputed that Foster was informed of this offer.
Should Foster then have been told that he needed independent counsel? Coker testified he did not advise him because he could not see at that stage that it could have accomplished anything.
As a practical matter Coker was probably correct, although it would have been professionally safer for him to have advised Foster at that time to seek it. Coker's failure to so advise Foster is understandable because Foster's answer to Coker when informed of the $45,000 offer was to request that it be accepted, which is all that any attorney he may have consulted could have demanded. The insurance company by contract had control of the defense of the case. Furthermore, it is totally unrealistic to suppose that if Foster had contacted some outside attorney he would have undertaken to enter the defense of the case alongside Coker and Williamson. Had such attorney been consulted, a demand from him that the case be settled within policy limits at the peril of a later suit by Foster for bad faith refusal to settle would have been the best service he could have rendered. Foster secured all those rights for himself when he requested the suit to be settled within policy limits. Indeed there is authority for the proposition that in dangerous cases it is the duty of the insurance carrier to initiate settlement offers on its own. Fulton v. Woodford, 26 Ariz. App. 17, 545 P.2d 979 (1976); Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 323 A.2d 495 (1974). Thomas v. Western World Ins. Co., 343 So.2d 1298 (Fla. 1977); Davis v. Nationwide Mut. Fire Ins. Co., 370 So.2d 1162 (Fla. App. 1979). Therefore, even though it might be abstractly argued that Coker should have told Foster to seek independent advice, there can be no doubt that his failure to do so caused Foster no damage.
The final two steps were two subsequent offers to settle, one during trial for either $35,000 or $40,000, and the last offer for $30,000 while the jury was retired to consider its verdict.
Coker and Williamson had the positive duty again to specifically inform Foster of these offers just as Coker informed Hartford. Both attorneys testified that Foster was informed of these offers. Foster denied it, and positively denied that he was told of the $30,000 offer. A jury issue was thus presented on liability on the part of the defendants for failure of the attorneys to notify Foster of the $30,000 settlement offer. But there is no jury question on the damage caused by such failure. Why? Because it is clear that if Foster had been told it would have made no difference. Foster never at any time claimed that had he been told of these offers, he would have paid the extra money out of his own pocket to settle. Had he done so, we would have the case of Lysick v. Walcom, supra. In that case the attorney delayed communicating to the plaintiff an expressed willingness of the insured client's estate to contribute the necessary difference between the settlement offer and what the carrier was willing to pay, and also delayed informing the administrator of the insured's estate of the carrier's willingness to pay its policy limits, arguably resulting *275 in no compromise being effected. The California court of appeal held that there was a jury question on whether this delay was a proximate cause of the loss to the insured's estate.
In this case not only is there a total absence of any claim or suggestion by Foster that if he had been told of the $30,000 offer, and $25,000 counter-offer by Hartford, that he would have attempted to raise the difference out of his own pocket, the record suggests quite the contrary. Even after trial Foster was unwilling to permit Coker to attempt to negotiate any settlement whereby he might have to pay something.
It was incumbent upon Foster not only to show that there was a breach of duty owing him by his attorneys, but that he was damaged thereby. Lysick v. Walcom, supra; Hickox by and through Hickox v. Holleman, 502 So.2d 626, 633-634 (Miss. 1987); Fulton v. Woodford, supra; Mallen and Levitt, Legal Malpractice, supra, § 534. He totally failed to show any damage caused by any such breach of duty.[13]
There remains but one other area where Coker alone subjected himself to a possible conflict of interest claim, and this was when he suggested to Napper that if the case could be settled for $25,000 to pay it.
Here again we must carefully adhere to what the record in this case shows. True, a lawyer cannot serve two masters, but in this instance Coker's recommendation to Napper was not an attempt to help Hartford, but was for the benefit of Foster. His recommendation to Napper was for Hartford to pay something which neither Coker, Williamson nor Napper thought the company either owed or would otherwise have to pay. The only reason Coker made the recommendation was to help Foster.
Surely Coker and Williamson cannot be faulted for having confidence in their case. Aside from the facts we have already detailed, let us look for a moment at the parties and trial venue. Foster and Harris were two white residents of Simpson County operating a respectable retail furniture store which had been in business many years. The plaintiff was a non-resident black, illiterate and unemployed, upon whose breath the investigating officer (from his county) said he smelled alcohol just after the accident. Harris's pretrial statements and his testimony revealed no negligence on his part.
Williamson, a local attorney with many years trial experience and attorney for the county board of supervisors, testified that if liability coverage had been unlimited he would not have recommended paying anything. Coker likewise testified that if Foster had either had no insurance coverage or unlimited coverage he would not have recommended paying $25,000.
Then why did Coker first suggest that Napper consider paying $20,000 to $25,000 in settlement, and conclusion of trial recommend that Hartford pay $25,000? He did it to help Foster, and thereby remove from Foster the possibility, albeit to Coker and Williamson remote, of a verdict in excess of $50,000.
Had Coker been more professionally cautious and made no recommendation he may have escaped some of the problem he and Williamson had to face in the subsequent Foster bad faith trial. It is nevertheless clear that in doing so he thought he was helping Foster, and leaning in Foster's favor as against his other client Hartford. Whatever may be said of his professional caution, insofar as Foster personally was concerned, Coker's heart was in the right place. Indeed, at that point in time Napper may have suspected Coker was not acting in Hartford's interest.
It is also true that the best of intentions on the part of Coker would not absolve him in any subsequent lawsuit by Foster, if this recommendation harmed Foster in any way.
The question is, did it? Here again the record is absolutely clear, it did not.
*276 If Coker had not made this recommendation Hartford might not have offered anything to settle the case. Most assuredly Napper would not have authorized as much as $25,000 in a counter-offer, because he testified that when he gave Coker this authority he "hoped they didn't take it." Napper obviously wanted for Hartford to takes its chances before the jury.
The final question: was Coker under any duty to Foster to recommend more? He was not. He certainly was under no ethical or legal obligation to Foster to ask his other client to pay something he did not honestly and realistically think it owed.
In sum there is nothing in this record to show that a breach of duty on the part of either Coker or Williamson harmed Foster in any way.
There are many cases where attorneys representing insurance companies and their insureds have been held to account for breach of professional duty. We have cited some: Betts v. Allstate Ins. Co., supra; Lysick v. Walcom, supra; Rogers v. Robson, Masters, Ryan Rrumond & Belam, supra; Lieberman v. Employers Ins. of Wausau, supra; Hamilton v. State Farm Mut. Auto. Ins. Co., supra.
This is not such a case. See also, Mallen and Levitt, Legal Malpractice, supra, Ch. 17, § 530-539, and cases cited.
It follows that the judgment of the circuit court should be reversed and judgment rendered here for the appellants. This holding dispenses with the cross-appeal of Foster as to his punitive damage and prejudgment interest claim.
ON DIRECT APPEAL, JUDGMENT REVERSED AND RENDERED; AFFIRMED ON CROSS-APPEAL.
HAWKINS, P.J., ROY NOBLE LEE, C.J., and ANDERSON, GRIFFIN, and ZUCCARO, JJ. concur, joined by DAN M. LEE, P.J., as to liability of Coker and Williamson.
PRATHER, J., dissents; joined by DAN M. LEE, P.J., as to liability of Hartford Accident & Insurance in Parts III, VIII, and IX; and joined by ROBERTSON, J., in Parts I, II, III, and VIII.
ROBERTSON, J., dissents with separate written opinion.
SULLIVAN, J., not participating.

APPENDIX I
From the uncontradicted testimony and the physical facts, it seems highly unlikely Harris was on the wrong side of the road when the vehicles collided. If the pickup had been on the wrong side of that narrow road, most likely there would have been a head-on collision.
Also important is the undisputed fact that the pickup was either stopped or almost stopped at the time of collision, while the car continued to travel at least another 200 feet.
In addition to this there is Harris's testimony, corroborated by physical facts at the scene as related by two law enforcement officers of Jefferson Davis County, that the pickup was on its side of the road, and Harris had done everything he could to avoid the accident. Sims, on the other hand, obviously kept his left arm and hand out the window while he continued to drive with his right hand, and either did nothing or virtually nothing in avoidance of the collision.
Also, for the rear of the pickup to have slid around and sideswiped the left center of the car would have violated a basic law of physics, centrifugal force. The pickup was going around the outside of the curve.
It is likewise difficult to believe the vehicles could have been damaged as they in fact were if Harris had been "cutting in" as Sims claimed. Then there is Sims's own testimony that, while driving with just one hand, he "blowed the whistle twice." Thus, there were two times in those brief moments of crisis when no hand was on the steering wheel.
Defense counsel had every good reason to have confidence in their case. From this record, there is certainly nothing amiss in Coker advising his clients that they had a *277 good defense. Liability was clearly a long shot.

APPENDIX II
Crum v. Anchor Cas. Co., 264 Minn. 378, 119 N.W.2d 703 (1963), holds that any attorney retained by insurer to defend its insured will not be permitted to take a position adverse to his insured client favorable to insurer.
American Employers Ins. Co. v. Goble Aircraft Sp., 205 Misc. 1066, 131 N.Y.S.2d 393, 401 (1954), holds the defense lawyer's duty to the insured is "paramount," and can take no action which, while beneficial to the carrier, "needlessly subjects the assured to judgment in excess of policy limit."
Schwartz v. SAR Corp., 19 Misc.2d 660, 195 N.Y.S.2d 496, 503 (1959), holds that the attorney employed by carrier receiving information leading him to believe plaintiff and defendant were colluding to defraud insurance company has duty to withdraw from case. He cannot "take up the cudgels of the insurance carrier."
In Spadaro v. Palmisano, 109 So.2d 418 (Fla.App. 1959), two old friends riding in a car were involved in a motor vehicle collision in which Spadaro was injured. Spadaro sued the owner Palmisano, alleging negligent driving. Investigation revealed Spadaro, not the owner Palmisano, was probably the driver. Yet Palmisano contended he was driving. The Florida Court of Appeals held the insurance company lawyer could not attempt to impeach his own client's testimony.
[T]he attorney-client relationship requires the utmost in fiduciary trust, even though this relationship might be an incident of an insurance contract. Fortunately, collusive suits are rare; however, when they do occur, or when there is reason to believe that such is being attempted, it is not proper for counsel to continue to represent both parties. Counsel is then torn between his obligations to two clients who have conflicting interests. The Biblical mandate that "No man can serve two masters" has its modern-day application in cases of this nature. See Canon 6, Canons of Professional Ethics, 31 F.S.A.
This case is interesting because the defense lawyer in attempting to show Palmisano, the injured, was not the driver, in no way caused any monetary damage to Palmisano. The court did not consider this fact.
Allstate Insurance Co. v. Keller, 17 Ill. App.2d 44, 149 N.E.2d 482 (1958), also had the question of who was the driver, the insured defendant or the plaintiff. The Illinois appellate court held the insurance company-employed attorney should not have undertaken the defense.
In Parsons v. Continental National American Group, 113 Ariz. 223, 550 P.2d 94 (1976), the insurance company defended on a reservation of rights as to whether an injury inflicted by an insured was negligent or intentional. If the latter, the policy excluded coverage. The company-employed counsel learned in representing the insured client that the act was intentional and conveyed this information to the carrier. Following a judgment for the plaintiff, in a garnishment proceeding against the carrier, the same law which had represented the insured represented the carrier. The Arizona Supreme Court held that law firm violated its ethical responsibility to keep client communications inviolate, and this conduct by legal counsel estopped the carrier from denying coverage. The court noted that as between the company and the insured, the "highest duty is to the insured and ... the lawyer cannot be used as an agent of the company to supply information detrimental to the insured." Id. 550 P.2d at 98.
O'Marrow v. Borad, 27 Cal.2d 794, 167 P.2d 483 (1946), involved a motor vehicle collision injuring each driver, and each filed suit. Both had the same liability insurance company. The California Supreme Court held the insurance company was not entitled in this case to control the defense for both, but would have to compensate independent counsel retained by insured to defend the case. Again, in Brohawn v. Transamerica Insurance Co., 276 Md. 396, 347 A.3d 842 (1975), the insurance company was required to defend a claim in *278 which there was a conflict whether the insured had injured another negligently or wilfully, the complaint alleging both. The Maryland court held the company had to furnish the defendant independent counsel or funds with which to retain her own defense counsel.
In Rogers v. Robson, Masters, Ryan, Brumund and Belom, 74 Ill. App.3d 467, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979), the plaintiff doctor sued the law firm employed by the carrier who had defended him in a malpractice case for settling a case after being told he did not wish to settle. Although the policy specifically authorized the insurance company to settle without permission of the insured, the Illinois court held that when the doctor told the law firm he did not want the case settled, this presented a conflict of interest between him and the carrier, and the law firm should have withdrawn from the case.
Lieberman v. Employers Ins. of Wausau and McDonough, 84 N.J. 325, 419 A.2d 417 (1980), was a medical malpractice suit. The liability policy provided such a suit could only be settled with the written consent of the insured. The company-employed defense counsel settled the case at the direction of the carrier without obtaining the consent of his client, or consulting with him. The New Jersey Supreme Court held this constituted legal malpractice.
In J.W. Hill & Sons, Inc. v. Wilson, 399 S.W.2d 152 (Tex.Civ.App. 1966), the Texas court held that when a trial court is informed by the attorney employed by the carrier of a conflict created by factual question of coverage under the policy, it must permit the attorney to immediately withdraw from the defense. The court further held it would be error to permit such counsel to continue in the case, even if it were agreeable to all parties.
PRATHER, Justice, dissenting:
I respectfully dissent from the majority opinion and express my views of the facts and the law of this case in a separate opinion.
This suit involves the triangular relationship of an insurer, insured, and attorney, and presents basically two issues: (1) whether an attorney retained by a liability insurance carrier to represent an insured in defense of a claim may refuse to settle that claim within the policy limits upon instruction of the insurer but contrary to the wishes of the insured; and (2) what duty is owed by the insurer to its insured in settlement offers within the policy limits?

I.
On August 4, 1976, John L. Sims and Donald G. Harris were involved in a motor vehicle accident near Bassfield, Mississippi, on a county gravel road at a point where the road curved. Harris was the son-in-law of Royce Foster and was driving a truck owned by Royce Foster d/b/a Foster Furniture. The two vehicles were traveling in opposite directions and each driver contended that his vehicle was located on his own proper portion of the road and that the other driver crossed into the improper lane of travel.
The first witness to arrive at the accident scene, was Arthur Ray Michael, brother-in-law to John Sims. Having heard the collision of the vehicles, Michael ran to the accident scene some 500 feet from his home. He found the Harris truck "in the middle of the road" and the Sims' car slowly rolling down the road some several hundred feet away. After assisting in stopping Sims' car and seeing Sims' severely torn left arm, Michael left to get a law enforcement officer to the scene at Harris' request so that he could move his truck. Upon returning to the scene, Michael testified that the Harris truck had been moved to the side of the road and that several persons and vehicles had gathered at that location. At trial two law enforcement officers testified for the defense as to the location of debris about one and one-half feet inside Harris' proper lane of traffic. Tracts from the debris to the vehicles were traced by the officers. On cross-examination, both officers testified that they did not know how many vehicles had passed on the road prior to their arrival, and one officer testified that he did not know that the truck had been moved. A surveyor *279 testified that the road from shoulder to shoulder measured seventeen feet and that there was a two and one-half foot overhang of a tree onto Harris' side of the gravel road. No ticket was given to either party.
Sims had his left arm partially extended from the driver's window and sustained serious personal injury when this arm was crushed between the two vehicles. At least four operations were performed on Sims' left forearm which required the insertion of a steel pin and a metal plate.
The Foster truck was insured by Hartford Accident & Indemnity Co. The insurance policy, with a liability limit of $50,000 per person for bodily injury liability, provided Hartford with the "right and duty to defend any suit against the insured ... and [to] make such investigation and settlement of any claim or suit as it deem[ed] expedient... ."
Subsequently, Sims employed an attorney to make a claim on the Foster liability insurance policy. Hartford refused any payment to Sims, denying that Harris had been at fault in the accident. Sims ultimately filed suit against Royce Foster, (owner), Royce Foster, II (partner), and Donald G. Harris, (driver), alleging negligence and suing for $150,000 actual damages, $150,000 punitive damages and court costs. That suit will be referred to as the Sims v. Foster suit.
To defend the suit, Hartford employed Curtis E. Coker, a Jackson, Mississippi attorney who, in turn, associated George Williamson, a local attorney from Simpson County. There was disputed testimony between Coker and Williamson on one hand and Foster on the other whether Foster was verbally advised by Coker and Williamson that he could employ an attorney at his own expense to protect his interest in excess of his liability policy coverage. Foster denied he was advised of this fact. It is undisputed that there was no written notice by Hartford or the attorneys to the insured regarding Foster's right to independent counsel.
Foster, testifying by deposition, stated that he told Attorney Williamson two or three weeks before trial that the case could be settled within the policy limits.
On September 12, 1977, the morning the Sims v. Foster trial began, Sims' attorney offered to settle the case against Foster for $45,000. Although Foster maintained his son-in-law Harris was not negligent, Foster requested Coker to settle the case within the policy limits of $50,000 so that Foster would not be exposed to excess liability.
Coker relayed the $45,000 settlement offer to James Napper, a claims manager with Hartford, who agreed with Coker to reject the $45,000 offer. The trial proceeded.
During the trial, Sims made a second settlement offer of $35,000. Coker and Williamson conveyed the offer to Napper who did not consider it "attractive." Napper did, however, authorize Coker to settle the Sims v. Foster suit for $25,000. The Sims offer of $35,000 was rejected without being communicated to Foster by his attorneys.
The record is clear that Coker relied on Foster's belief that Harris was not at fault, even though Coker knew Foster was not a witness to the accident. Relying on other evidence adduced at trial and on Foster's opinion, Coker believed a defense verdict would be returned.
When both sides of the Sims v. Foster suit rested and the jury was deliberating, Sims made a final settlement offer of $30,000. Again, without conveying the offer to Foster, Coker and Williamson rejected the offer. There is conflicting evidence in the record regarding whether Coker counter-offered to settle for $25,000.
After deliberation, the jury returned a verdict in favor of Sims for $80,000, $30,000 in excess of Foster's liability insurance coverage. Coker then offered to settle with Sims for $50,000, which was rejected. This Court subsequently affirmed the award of $80,000 without written opinion. Foster v. Sims, 364 So.2d 281 (Miss. 1978).
Foster paid the $30,000 excess judgment plus interest and other costs and filed suit against Hartford, Coker, and Williamson alleging bad faith, fraud, and strict liability. *280 Foster died January 8, 1983 and this cause of action was revived by Mrs. Royce Foster as administratrix of the estate of Royce Foster, deceased.
The instant case was tried in March, 1984 and resulted in a unanimous verdict in favor of Mrs. Foster for a $30,000 joint and several award against Hartford, Coker and Williamson. From that award, Hartford, Coker and Williamson appeal.

II.
This appeal raises numerous considerations that have been the subject of many recent commentaries in a developing field of law. These writings analyze the duties and liabilities of an insurer, the insured, and an attorney employed by an insurer to represent the insured. See, e.g. Mallen And Levit, Legal Malpractice § 522 (2d ed. 1981).
The gravamen of this action by Foster against Hartford, Coker, and Williamson is bad faith, fraud, and strict liability. The appellee asserts Hartford, Coker, and Williamson acted with conflicting interest and gave preference to the interests of the insurance company over the insured's interests. Several questions are presented:
(1) What is the insurer's duty to the insured in settlement negotiations?
(2) What is the duty of the attorney employed by the liability insurer to (A) the insurer and to (B) the insured whom he represents; and what is the attorney's responsibility when those duties come into conflict?
(3) Is the status of attorneys employed by insurance carriers to defend insureds that of agents of the carrier or independent contractors? and
(4) Are punitive damages or prejudgment interest recoverable?

III.

Insurer's Duty

A.
What duty does the insurer owe the insured when the insurer is considering a settlement offer within policy limits?
Under Foster's standard motorist liability policy, Hartford contracted to furnish a defense against any claim for liability against Foster. Hartford's duties were established by the terms of its contract, judicial interpretations of those contractual provisions, the statutes, and principles rationally derived therefrom. Georgia Casualty Co. v. Cotton Mills Products Co., 159 Miss. 396, 132 So. 73 (1931).
Put more abstractly, an insured may recover against his insurer only to the extent that the insured holds a right in that regard. Such rights emanate from primary rules which, upon investigation, may be found valid. Such rules will be general to one extent or another. The rights they generate are hardly susceptible of mechanical enforcement. As we expect the insurer to use those rules as best it can as guides and reasons for conduct, this Court should do likewise.
At least four clusters of valid rules relevant here may be found. First are the primary rules "privately made" by the insurance contract and flavored by valid rules of interpretation. Hartford contractually assumed the duty to defend Foster in any suit under the motorist liability policy with the contractual right to control the defense. Policies prepared by insurers will be construed favorably to the insured and strictly against the insurer to the extent reasonably necessary and without violence to plain language. New Amsterdam Casualty Co. v. Perryman, 162 Miss. 864, 140 So. 342 (1932); Boyd v. Mississippi Home Insurance Co., 75 Miss. 47, 21 So. 708 (1897).
Second, there are rules requiring that an insurer act in objective good faith towards its insured, i.e., that the insurer's dealings with its insured within the ambit of insurance contract pass an objective test of fair dealings.
Every contract contains an implied covenant of good faith and fair dealings. See, e.g., UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., 525 So.2d 746 (Miss. 1987); Ohashi v. Verit Industries, 536 F.2d 849, 853 (9th Cir.1976); Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d *281 916, 924 (Ala. 1981); Corwin Chrysler-Plymouth v. Westchester Fire, 279 N.W.2d 638 (N.D. 1979); Christian v. American Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977); See also, Restatement (Second) of Contracts § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement"); cf. Miss. Code Ann. § 75-1-203 (1972) (imposing general duty of good faith); but see Griffin v. Ware, 457 So.2d 936, 940 (Miss. 1984).
"Implicit in every contract of insurance is a covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefit of the agreement, and this includes a duty to settle claims without litigation in appropriate cases." Appleman, Insurance Law and Practice (Berdal ed.) § 4712, p. 446 (1979); See also, Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La. 1977).
This Court, along with other jurisdictions, recognizes the liability of an insurer to its insured, not only on the contractual agreement, but also for an insurer's fraudulent actions. Thus, there evolves a third rule that the insurer shall not act fraudulently or engage in fraudulent conduct toward its insured.
Mississippi caselaw holds that an insurer may be found liable in excess of its policy limits for failing to settle an action when its refusal to settle is so arbitrary and unreasonable as to constitute fraud. Farmers Gin Co. v. St Paul Mercury Indemnity Co., 186 Miss. 747, 191 So. 415 (1939); Martin v. Travelers Indemnity Co., 450 F.2d at 551. Proof of fraud must be by clear and convincing evidence. Cotton v. McConnell, 435 So.2d 683 (Miss. 1983).
The performance by the insurer of its contractual obligations may also give rise to a suit for the negligent per forming of its contractual duty to defend the suit. Waters v. American Cas. Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (1954).
In Farmers Gin Co. and Martin, recovery was sought based upon fraud and negligence. As in the case at bar, the Farmers Gin case was defended by competent counsel with full investigation of the facts and exercise of due diligence. However, one fact distinguishes the Farmers Gin case from the case sub judice  the insured was represented by independent counsel.
Fourth and finally, entering the subjective realm, insurers are prohibited from acting with gross disregard of the rights of their insureds or with malice toward their insureds. Our law allows recovery by an insured from its insurer may be had upon proof of "bad faith," a remedy independent of fraud, and requiring only a "preponderance of the evidence" standard of proof. See e.g., American Fidelity & Casualty Co. v. Greyhound Corp., 258 F.2d 709 (5th Cir.1958). Waters v. American Cas. Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (1954). Southern Farm Bureau Cas. Ins. v. Holland, 469 So.2d 55 (Miss. 1984), Luckett v. Mississippi Wood Inc., 481 So.2d 288 (Miss. 1985); Scott v. Transport Indemnity Co., 513 So.2d 889 (Miss. 1987); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 832 (Miss. 1986); Reserve Life Insurance Co. v. Magee, 444 So.2d 803 (Miss. 1983).

B.
Our primary source of the privately made duties is the insurance contract. Of relevance here is the language stating that Hartford has the "right and duty to defend any suit against the insured ... and [to] make such investigation and settlement of any claim or suit as it deem[ed] expedient... ." Consistent with its words, this language is subject to the rule of construction that doubtful or ambiguous questions of meaning be resolved against the insurer. To this end settlement is a form of defense. Moreover, "defend" is further broadened beyond defense at trial to include defense of the suit pretrial and certainly pre-verdict. The rule should be read, moreover, together with the insurer's duty of objective good faith and fair dealings.
Today's case presents a special context: the insured was sued for an amount in excess of the policy limits. This was followed by Plaintiff Sims' pre-trial and midtrial offers to settle within the policy limits, *282 coupled with the insured's (Foster's) demand that Hartford so settle. The offers were in descending amounts, from $45,000 to $30,000. In this context, the general rules imposing duties to defend and settle in good faith yield sensibly more specific duties, all being subject to a general requirement of timely performance.
At the very least, Hartford was validly obligated to Foster to perform these duties:
(a) Hartford had the duty to move promptly to engage on Foster's behalf the services of an attorney who would have the same legal and ethical duties to Foster as if Foster employed that attorney himself. By paying insurance premiums, Foster participated in what might be termed a private prepaid automobile liability legal services plan. Foster made periodic premium payments into a fund managed by Hartford (at a profit) and subject to Hartford's obligation to use a reasonable portion of that money to secure one of the eventualities insured against: the engagement of counsel to defend the suit.
(b) As soon after notice of suit as was reasonably practicable, Hartford had a duty to notify Foster  the defendant in the civil action  that a judgment in excess of the policy limits was sought, but that Hartford would discharge its duty above described to defend. In addition, Hartford had a duty to notify Foster that Foster had the privilege of obtaining independent counsel and that Hartford would cooperate with such counsel to the extent that its interests and Foster's coincided.
(c) Hartford had a duty to communicate to Foster in a reasonable and timely fashion all settlement proposals submitted by the Plaintiff Sims or his attorney and all reasonable opportunities to settle.
(d) Hartford had a duty to take all reasonable steps to protect Foster's interests, specifically, Foster's obvious interest in not receiving an excess judgment. This duty, which is a part of Hartford's duty to defend, is separate and independent of and from the duty to defend at trial.
(e) Hartford had a duty to Foster to settle the Sims' claim within the policy limits on objectively reasonable terms.
Of course, an insurance company has no absolute duty to accept any settlement within the policy limits. On the other hand, absent the insured's unequivocal assent to the contrary, the insurance company does have the duty to settle on objectively reasonable terms. Put otherwise, in the context of possible excess exposure, and the insured's demand that the case be settled within the policy limits, the insurer has a duty to accept an objectively reasonable settlement demand received from plaintiff.
Although many times it would be in the insured's best interest to have the suit settled within the policy limits, the obligation of the insurer to settle within the policy limits is not absolute. Georgia Casualty Co. v. Cotton Mills Products Co., 132 So. at 77. It follows then that insurers are not strictly liable for excess judgments returned against their insureds. Appelman, supra at 432. See also Cochran, The Obligation to Settle Within Policy Limits, 41 Miss.L.J. 398, 400 (1970).
A contract of insurance gives the insurer the exclusive right to settle the insured's claim with a corresponding implied duty to exercise good faith and fair dealing with its insured. Waters, 73 So.2d at 531.
This duty to have the insured's interest in mind when settlement demands are being considered is a function of the insurer's duty to defend, which is a contractually undertaken duty independent of all others the insurer shoulders.
When an insurer undertakes the responsibility of an insured's defense, one of the most crucial of the insurer's obligations is its implied duty to evaluate settlement offers from the joint perspective of its own interests as well as the interests of the insured. The proper execution of this implied duty is one example of good faith. Martin v. Travelers Indemnity Co., 450 F.2d 542, 551 (5th Cir.1971). Appleman, supra, § 4711 (Supp. 1971). The insurer's implied duty is especially important when the insured is potentially exposed to liability beyond his policy limits, but the plaintiff is willing to settle within the policy limits.

*283 The right to control litigation, which the insurance contract gives to the insurer, is subject to an obligation to give the insured's interests equal consideration if the potential recovery in a suit exceeds policy limits. Failure to consider its insured's interests equally with its own when contemplating settlement of a claim subjects the insurer to liability for any judgment in excess of policy limits. (Citation omitted)
Sanders v. Standard Mut. Ins. Co., 142 Ill. App.3d 1082, 97 Ill.Dec. 258, 492 N.E.2d 917 (4 Dist. 1986).
In the end the question of what terms of settlement offers are reasonable is a judgment call, based on the totality of the circumstances, ranging from the facts of the case, including testimony of different witnesses, exhibits, etc. as well as such intangibles as the likely credibility or believability of various witnesses, propensities of juries in the community and other such pragmatic factors. Insurers hold themselves out to their insureds as being able to make such judgment calls with reasonable competence. Because of that holding out to the public, "[t]he insurer, as a professional defender of lawsuits, is held to a higher standard than that of an unskilled practitioner." Appleman, § 4712, p. 425.[1]
The likely economic impact of settlement upon the insurer may be viewed in the context of Hartford's opinion that, before the case went to the jury, Sims' claim was worth approximately $25,000.00 in settlement. In the case of each succeeding (and declining) offer by the plaintiff  $45,000.00  $35,000.00  $30,000.00, the insurer had a duty to settle if the offer was objectively reasonable.
Objective reasonableness in this context is a question committed by law to the trier of fact, here a jury. The jury implicitly found the $30,000.00 offer objectively reasonable and, implicitly further, that Hartford's agents had it in hand in sufficient time to effect the settlement. Our scope of review of such jury determinations is familiar. See, e.g., regarding sufficiency of the evidence to sustain a verdict at all, Stubble-field v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); and Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); and, regarding whether the verdict is so against the weight of the evidence that a new trial ought be ordered, Anchor Coatings, Inc. v. Marine Industrial Residential Insulation, Inc., 490 So.2d 1210, 1215 (Miss. 1986); Clark v. Columbus & Greenville Railway Co., 473 So.2d 947, 950 (Miss. 1985). This Court regards the jury finding as beyond our authority to disturb.
Construing the evidence favorably to Foster (as we must in light of the verdict), Hartford breached its duty to defend and settle in good faith. Hartford breached each of the five sub-duties identified as a part of that general duty. How much of Foster's damages of $30,000.00 ($80,000.00 verdict minus $50,000.00 policy limits) was caused by which breach of duty I need not decide.
As to the judgment of $30,000.00 against Hartford, I would affirm for the reasons above outlined.

IV.

Attorney's Duty
What duty is owed by the attorney to the liability insurance carrier that retains and pays him, and to the insured whom he represents, when a suit is filed for damages in excess of the insurance policy limits?
An attorney owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly *284 situated. Hickox v. Holleman, 502 So.2d 626, 634 (Miss. 1987). Additionally, the attorney-client relationship is of a fiduciary nature, and in all relations with his client an attorney has the duty to maintain the utmost good faith, honesty, integrity, fairness and fidelity. 7A C.J.S. Attorney and Client § 234, p. 424 (1980). An attorney "is not answerable for every error or mistake, and will be protected as long as he acts honestly and in good faith to the best of his skill and knowledge... ." Nause v. Goldman, 321 So.2d 304, 308 (Miss. 1975) (emphasis added).
In an analogous area of medical malpractice, this Court has held that "The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice; and a physician is not a warrantor against bad results." Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971).
Likewise an attorney is not a warrantor against bad results. To hold otherwise would be to require of him the gift of foretelling the future not often given to mankind. "We know of no mortal who has been vouchsafed this power since the days of the Bible prophets; and as we understand it, these ancient seers had access to some inside information not presently available to counsel in damage cases." Ferris v. Employers Mutual Casualty Co., 255 Iowa 511, 122 N.W.2d 263, 269 (1963).
Attorney has the normal attorney-client relationship with insured. He may have nor exercise any duties to the insurer which are in conflict with duties to insured, absent express contrary consent from the insured. An attorney owes his client undivided allegiance. After the attorney has received the confidence of a client, the attorney may not act both for the interests of his client and the conflicting interest of another without the free and intelligent consent of his client. Ishmael v. Millington, 241 Cal. App.2d 520, 50 Cal. Rptr. 592 (1966).
When an attorney represents the insurer and the insured, he owes to both a high duty of care. Insofar as the insured is concerned, the attorney owes him the same obligations of good faith and fidelity as if he had retained the attorney personally. Lysick v. Walcom, 258 Cal. App.2d 136, 65 Cal. Rptr. 406, 28 A.L.R.3rd 368 (1968). When an attorney attempts dual relationships without making the full disclosure required of him, he may be civilly liable to the client who suffers loss caused by his lack of disclosure. Id. Likewise, when an attorney's conduct on behalf of the insurer breaches his duty to the insured by prejudicially affecting the insured's substantial rights, the breach of duty to the insured amounts to legal malpractice. Ivy v. Pacific Auto Ins. Co., 156 Cal. App.2d 652, 320 P.2d 140 (1958).
According to Mallen and Levit, Legal Malpractice § 1 (2d ed. 1981):
Some courts seem to distinguish a breach of the fiduciary obligations from legal malpractice. The prevailing and more reasonable view, however, is that legal malpractice encompasses any professional misconduct whether attributable to a breach of the standard of care or of the fiduciary obligations. In recognition of the dual bases of an attorney's liability, some courts have referred to the fiduciary obligations as setting forth a standard of "conduct." Thus, under the theoretical approach legal malpractice may be defined as "a breach by an attorney of either the standard of care or of the standard of conduct."
Thus, legal malpractice may be a violation of the standard of care of exercising the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, or the breach of a fiduciary duty. The declaration here charges a fiduciary violation as the basis for this malpractice action.
To recover under the negligence theory of legal malpractice, the client must prove the existence of an attorney-client relationship, the acts constituting negligence, that the negligence proximately caused the injury, and the fact and extent of the injury. Hickox v. Holleman, 502 So.2d at 634; Hutchinson v. Smith, 417 So.2d 926 (Miss. 1982); Thompson v. Erving's Hatcheries, Inc., 186 So.2d 756 (Miss. 1966).
*285 However, the legal malpractice alleged in this case is a violation of the standard of conduct, not breach of the standard of care. The elements of this cause of action are the same as other legal malpractice actions except, instead of proving negligence, the plaintiff must prove a violation of the attorney's fiduciary duty.
The undisputed facts of this case created a jury question regarding such a violation. The attorneys were representing two interests, those of the insurer and the insured, and were in an untenable conflict of interest situation where the wishes of the insured were contrary to the wishes of the insurer. It must be noted that Foster denied being told that he could employ independent counsel. Williamson and Coker testified to the contrary.
The evidence showed that Foster wanted his attorneys Coker and Williamson to settle the case for $45,000, but they refused to recommend a settlement of $45,000 to Hartford. The evidence showed settlement offers of $35,000 and $30,000 were communicated to Coker and Williamson who did not relay the offers to Foster. The evidence further showed Coker and Williamson recommended and received authority to settle the case for $25,000. The Sims' attorneys did not recall this counter-offer of $25,000. Fiduciary duty required at very least timely communication to Foster of each settlement demand.
Once a settlement offer is made within the policy limits, does attorney (Coker) have duty to try to persuade Hartford to settle  without Foster's informed consent to the contrary? This Court answers yes. If at this point an attorney is willing to do this, he has duty to withdraw from further representation of the insured.
By recommending Hartford settle for $25,000, Coker and Williamson risked exposing Foster to $250,000 excess liability ($300,000  $50,000) in order to save Hartford $25,000 ($50,000  $25,000).
I would hold that the evidence at trial was sufficient to create a jury question regarding the undivided loyalty and the good faith of Coker and Williamson.
Furthermore, if the jury found that Coker and Williamson breached their fiduciary duty, it naturally follows that Coker's and Williamson's breach of duty was the proximate cause of Foster's injury. After all, had Coker and Williamson persuaded Hartford to settle within policy limits, the jury could have found no breach of duty at all.
The appellants contend there was no evidence to prove Hartford would have settled for $30,000. The appellants overlook Coker's testimony that Hartford followed his recommendations "to the T." It is reasonable to infer from Coker's testimony that Hartford would have settled for $30,000 had Coker so recommended. Hartford's total reliance on the recommendations of the attorneys vested the attorneys with authority to make the ultimate settlement decisions.

V.

Relationship of Insurer and Attorney
Hartford contends Coker and Williamson were independent contractors whose misconduct, if any, could not be imputed to Hartford. See, Mississippi Power Co. v. Brooks, 309 So.2d 863 (Miss. 1975) (employer of an independent contractor has no vicarious liability for torts of independent contractors.)
Caselaw analyzing the status of an attorney who is retained to fulfill an obligation of an insurance company is divided. Hartford cites Merritt v. Reserve Insurance Co., 34 Cal. App.3d 858, 110 Cal. Rptr. 511 (1973), which held that an attorney retained by an insurance company to represent an insured is an independent contractor. Id. 110 Cal. Rptr. at 527. See also, Spindle v. Chubb/Pacific Indemnity Group, 89 Cal. App.3d 706, 152 Cal. Rptr. 776 (1979).
To the contrary, Blakely v. American Employers Ins. Co., 424 F.2d 728 (5th Cir.1970) held that the retained attorney was an agent for which the insurance company was liable. Explaining the rationale behind its ruling, the Court stated:
The duty to defend is an important and distinguishable part of the contract of insurance. In spite of American's outright *286 promise to defend, the insurer now seeks to avoid responsibility for damages sustained by the assured by relegating its responsibility over to legal counsel as someone akin to an independent contractor. Those whom the insurer selects to execute its promises, whether attorneys, physicians, no less than Company-employed adjusters, are its agents for whom it has customary legal liability. Highway Insurance Underwriters v. Lufkin-Beaumont Motor Coaches, (Tex. Civ.App.) 215 S.W.2d 904; Smoot v. State Farm Mutual Automobile Ins. Co., 299 F.2d 525 (5 Cir., 1962).
Blakely v. American Employer's Ins. Co., 424 F.2d at 734. See also, National Farmers Union Property & Casualty Co. v. O'Daniel, 329 F.2d 60 (9th Cir.1964).
In addition, Mallen and Levit, supra § 525, p. 630-31 makes the following observations:
The majority of jurisdictions have concluded that the insurer's duty to defend is nondelegable and therefore an insurer cannot insulate itself from liability merely by hiring competent counsel. These courts, either expressly or implicitly (by imposing imputed liability) hold that counsel is the insurer's agent, and thereby render it liable to the insured for any negligence in the handling of the defense. One rationale for this conclusion is that since the insurer maintains the exclusive right to control the defense, it should not disclaim the correlative responsibility. In this context, the test of the insurer's liability is not whether it complied with the implied covenant of good faith and fair dealing, but whether the attorney's conduct fell below the standard of care.
The facts to which both Coker and Hartford's claim manager testified clearly evidence that the company controlled the settlement negotiation. The claim manager testified that part of his duty was to evaluate claims and that in fact did seek from Coker his opinion and advice. However, clearly it was the claims manager who controlled the final decision of rejecting or authorizing an offer. Since control is the primary distinction between the principal agent relationship, as opposed to an independent contractor relationship, the facts of this case squarely fit the former.
This Court, following the majority view, holds that Coker and Williamson, acting as attorneys for Foster, were also acting as agents of Hartford. Hartford therefore is liable for the breach of the standard of conduct of Coker and Williamson when committed within the scope of their employment. See, Odier v. Sumrall, 353 So.2d 1370, 1372 (Miss. 1978).

VI.
Having analyzed the authorities from this and other jurisdictions, this Court holds the complaint properly asserted a cause of action against Coker and Williamson for the conflict of interest held by them in representing the interests of the insurer and insured. The Court holds the evidence at trial created a jury question whether Coker and Williamson breached their fiduciary duties to Foster. The Court also holds the jury was properly instructed. Further, applying the standards for appellate review to the motion for directed verdict, peremptory instruction, and judgment notwithstanding the verdict, the trial court's actions were proper.
As to Hartford's liability, this Court finds no error in the trial court's action. An insurer's liability is predicated upon its contractual right to control litigation, and its liability for its agents.
In the present case, the jury found that Coker and Williamson gave preferential treatment to the interests of Hartford over the interests of Foster. Because Coker and Williamson were agents of Hartford acting within the scope of their employment, their actions constitute bad faith for which Hartford is responsible. See, Odier v. Sumrall, 353 So.2d at 1372.

VII.

Should Foster have been allowed to present punitive damages evidence and instructions?
"To recover punitive damage from an insurer for amounts over and above policy *287 benefits an insured must prove by a preponderance of the evidence either (1) that the insurer acted with malice or (2) that the insurer acted with gross negligence or reckless disregard for the rights of others." Aetna Cas. & Sur. Co. v. Day, 487 So.2d 830 (Miss. 1986); Weems v. American Security Ins. Co., 486 So.2d 1222 (Miss. 1986); State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242 (Miss. 1985).
Quoting further from Day, this Court held:
The Simpson opinion further enunciates that "punitive damages are not mandated by the absence of an arguable reason ... because the denial of the claim could be the result of an honest mistake or oversight  ordinary or simple negligence." The absence of an "arguable reason" does not necessarily establish that the insurer acted with malice or with gross negligence or reckless disregard for the insured's rights.
487 So.2d at 832.
Punitive damages are assessed as an example and warning to others and should be allowed only with caution and within narrow limits. Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 247 (Miss. 1977); State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 249 (Miss. 1985).
The trial judge held, "[T]his Court doesn't feel at this time that punitive damages would be allowed in this case. However, if some time during the remainder of the case, we look at it differently, I'll let you submit whatever proof that you would want to submit at this time."
In Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985), this Court held, "Punitive damages do not follow as the day the night every finding that a defendant has been guilty of fraud. Though fraud is frequently an ingredient of an award of punitive damages, it is clear from our cases that more is required." The same rationale may be applied to the instant case.
Punitive damages are assessed only in extreme cases. Gardner v. Jones, 464 So.2d at 1148; Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983). "[P]unitive damages are recoverable where the defendant has done to the plaintiff such a wrong as to import insult, fraud, oppression or reckless disregard for the rights of the plaintiff." Gardner v. Jones, 464 So.2d at 1149.
The trial judge in the instant case, exercising his sound discretion, determined the facts of this case were not so extreme as to warrant punitive damages instructions. I would concur that the trial judge did not abuse his discretion to refuse punitive damages instructions.

VIII.

Should the trial judge have awarded prejudgment interest?
"An award of prejudgment interest rests in the discretion of the awarding judge." Aetna Cas. & Sur. Co. v. Doleac Elec. Co., Inc., 471 So.2d 325, 331 (Miss. 1985). See also, Glantz Contracting Co. v. General Elec. Co., 379 So.2d 912 (Miss. 1980). Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made, or where the denial of the claim is frivolous or in bad faith. Aetna Cas. & Sur. Co. v. Doleac Elec. Co., Inc., 471 So.2d at 331.
Further, "in the absence of statute or contract providing expressly therefor, or proof sufficient to support an award of punitive damages, there can be no recovery of attorneys fees or pre-judgment interest." Stanton & Associates, Inc. v. Bryant Construction Co., 464 So.2d 499, 502 (Miss. 1985); Litten v. Grenada County, MS, 437 So.2d 387, 388 (Miss. 1983); Aetna Casualty & Surety Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979).
Finding no statutory or contractual provisions allowing prejudgment interest in this case, and concurring in the trial judge's decision to disallow punitive damages instructions, I would also affirm the trial judge's decision to deny prejudgment interest.

CONCLUSION
I would recognize a bad faith cause of action against an insurance company that *288 allegedly failed to give equal consideration to the interests of its insured when negotiating settlement of a liability action within the policy limits. This issue presented a jury question which was answered in favor of the insured.
I would also recognize a legal malpractice cause of action based, not upon negligence of the attorneys, but upon the breach of fiduciary duties. Conflict of in terest issues were properly submitted to the jury who decided the issues against the attorneys. There was enough evidence in the record to support the findings of the jury. For that reason, I would hold the decision of the Circuit Court of Simpson County should be affirmed.
DAN M. LEE, P.J., joins this opinion as to liability of Hartford Accident and Insurance in Parts III, VIII and IX.
ROBERTSON, J., joins Parts I, II, III and VIII of this opinion.
ROBERTSON, Justice, dissenting:
Today's case is an important one, discussing duties of insurance defense counsel and the nightmarish conflicts of interest they experience not infrequently. I regret that I cannot agree with my colleagues.[1] I would have preferred that we speak with clarity, reason and unanimity. Not only do we not achieve these; we compromise the lawyer's duty on the altar of expediency and other lesser gods. I dissent, for I am not yet willing to surrender counsel's code of conduct to the real or imagined fears of insurers' insistence.
I begin simply. Suppose that Royce Foster, sued by John L. Sims, had hired a lawyer to defend him, and had paid that lawyer with his own funds. Foster would have been entitled to the absolute, unswerving loyalty of that lawyer. Foster is due no less from defense counsel for whose services he has paid indirectly by paying periodic premiums to his liability insurance carrier. In a very real sense, liability insurance carriers (among other things) administer a prepaid automobile liability legal defense plan designed (among other things) so that it affords the insured the same zealous advocate he would have if he hired counsel on his own. The plan also assures availability of funds with which to pay such counsel.
The other side of the coin is identical. The lawyer hired by the insurer for the benefit of the insured has the same duties to the insured as though hired and paid directly by the insured.
Insurance defense counsel are entitled to no exemption from legal and ethical duties imposed upon lawyers generally. Those duties derive in part from rules privately agreed upon between lawyer and client, see Hirsch Bros. & Co. v. R.E. Kennington Co., 155 Miss. 242, 253-54, 124 So. 344, 347 (1929), otherwise from rules governing the lawyer-client relationship imposed by the positive law. See Hutchinson v. Smith, 417 So.2d 926, 928 (Miss. 1982). Both of these may overlap with, but are to be kept distinct form, the ethical duties imposed upon one such as Appellant Coker[2] by the Code of Professional Responsibility. Ethical standards impose legal duties and confer legal rights only to the extent that such standards have been validly incorporated into our positive law. Attorneys' duties are likewise separate and distinct from the insurer's duties.
First, the moment of employment. Coker may have accepted representation on behalf of either the insured, Foster, or the insurer, Hartford, or both. At the outset, that is, at the time of formation of the lawyer-client relationship, our law was indifferent to the choice Coker made. Upon receiving a request from Hartford (whether Hartford be viewed as acting in its own behalf, or as Foster's agent, or in both *289 capacities) that he handle defense of Sims' suit, Coker had the prerogative to limit the scope of his representation. See Rule 1.2(c), Mississippi Rules of Professional Conduct [hereinafter "DR 1.2(c)"]. Coker could have chosen  and agreed  to represent (a) Hartford, or (b) Foster, or (c) both, to the extent of no conflict, or (d) both, where there be a conflict upon full disclosure and informed client consent. See DR 1.7.
In fact, Coker undertook to represent Foster in some sense. He entered an appearance in the Sims suit as counsel for Foster. But because the Sims suit was in excess of the policy limits, Coker was obligated from the outset to declare his allegiance. Foster was entitled to know then how much of a lawyer he had. Consistent with his options just noted, Coker could have limited his undertaking to Foster. For example, Coker could have said to Foster (a) "My primary allegiance is to Hartford, and I will represent you only to the extent there is no conflict of interest between your interests and those of Hartford," or (b) "I will defend you only with respect to trial, and you must fend for yourself on the question of settlement." Again, see DR 1.2(c) and 1.7.
The conflict of interest between Hartford and Foster was inchoate at the time of employment, i.e, it was not known whether the Sims suit could be settled within the policy limits. The conflict became actual when it first became reasonably probable that the case could be settled within the policy limits, that moment being no later than Sims' midtrial $45,000.00 settlement demand. See Lieberman v. Employers Insurance Co. of Wausau, 84 N.J. 325, 340, 419 A.2d 417, 425 (1980). Had Foster agreed that the settlement demand be rejected, the case would not be here today. Instead, Foster demanded settlement within the policy limits. At that moment the Hartford-Foster conflict became quite real. Hartford's interest  and duty  was in making an objectively reasonable settlement. Foster cared not a hoot for objective reasonableness. His interest  and demand  was that the suit be settled for any figure less than $50,000.00. Coker was caught in the middle. The identity of his client defines his duty  and ought determine his liability.
Turning for a moment to Hartford's duty to Foster, a point needs emphasis. While Coker could well have limited the scope of his representation as just suggested, Hartford had no such option. If Coker took the position that he would represent Foster only to the extent that Foster had no conflict with Hartford, then Hartford had a duty to act timely to employ someone else to represent Foster to the extent Foster's interests remained at risk and unprotected. Similarly, if Coker at the outset had exercised his privilege of limiting his representation to defense at trial, Hartford in that event had a duty, pursuant to its duty to defend, to act timely to engage the services of another attorney to represent Foster on the question of settlement. Hartford, as the for profit administrator of a pre-paid automobile liability legal services fund, had a duty to engage the services of one or more lawyers as loyal to Foster as would have been one hired by Foster and paid directly by him. Compare DR 1.8(f)(2). Such is the contractual and symmetrical consequence of Hartford's right to control the defense and settle if it wished. If Coker was going to be Hartford's lawyer, Hartford had a duty absolute to get someone else for Foster to the extent Foster's interests diverged from Hartford's  and to do so timely.
But none of these questions were resolved. Coker communicated to Foster no limitations upon the scope of his representation or loyalty. His entry of an appearance in Circuit Court on Foster's behalf is consistent with representation limited only by that case. When insurance defense counsel fails to limit his representation, doubts regarding his duty should be resolved in favor of the insured. In the overwhelming majority of cases such as this, the insurer and insurance defense counsel will be more aware of the insured's predicament than the insured himself. They should in law be presumed so. All of this is particularly so in light of the insurer's *290 contractual authority to control the defense.
Imposing upon counsel such as Coker the burden of clarifying any limitations upon his loyalty and duty to Foster is fair in the sense that counsel's capacity to protect himself clearly exceeds the client's. More formally, the burden upon insurance defense counsel of taking precautions necessary to avoid the insured being ineffectively represented with reference to his excess exposure[3] is far less than the costs to the insured (the cost of informing himself of his predicament and taking effective action to protect himself plus the magnitude of potential loss in the event that and to the extent that his excess exposure is not effectively protected by counsel), even when the insured's costs are discounted by the probability of his experiencing those costs. Cf. Maryland Casualty Co. v. City of Jackson, 493 So.2d 955, 960 n. 3 (Miss. 1986). Our law should fix that burden upon the party who can best bear it, the least cost risk bearer. On these facts Coker is it. Hence, the law's original indifference to Coker's selection of his role actively evolves to resolution of doubts in favor of Foster.
Under these circumstances, by the time the Hartford-Foster conflict became actual, Coker had waived his right to limit his representation of Foster. In other words, absent an express and early on limitation of the sort mentioned above, Foster, not Hartford, was Coker's client. Because this is so, Coker's duties to Foster were the same as would have developed upon him had he been employed by Foster directly. See Lysick v. Walcom, 258 Cal. App.2d 136, 65 Cal. Rptr. 406, 413 (1968); Crum v. Anchor Casualty Co., 264 Minn. 378, 119 N.W.2d 703, 712 (1963); American Employer's Insurance Co. v. Goble Aircraft, 205 Misc. 1066, 131 N.Y.S.2d 393, 401 (1954); Allstate Insurance Co. v. Keller, 17 Ill. App.2d 44, 149 N.E.2d 482, 486 (1958); Lieberman v. Employer's Insurance Co. of Wausau, 84 N.J. 325, 338, 419 A.2d 417, 424 (1980); Moritz v. Medical Protective Co., 428 F. Supp. 865, 871-72 (W.D.Wisc. 1977).
Repetitiously, I do not question that from the outset Coker had the privilege of representing Hartford and Foster, notwithstanding the inchoate conflict of interest, so long as full disclosure was made to Foster of all facts and circumstances incident to the conflict and Foster's consent was obtained. See DR 1.7(b); Lysick v. Walcom, 65 Cal. Rptr. at 414. Here no such disclosure was made nor informed consent secured. This being so, I know of no law, private or public, which would allow Coker to have or exercise any duties or loyalties to Hartford which were in conflict with his professional obligations and duties to Foster. See Rogers v. Robson, Masters, Ryan, Brumund & Belom, 74 Ill. App.3d 467, 30 Ill.Dec. 320, 325-26, 392 N.E.2d 1365, 1370-71 (1976).
Where, on facts such as these, a lawyer has done nothing to limit the scope of his duties to his client, the insured defendant in the civil action, that lawyer has at least three further duties:
(1) To notify the insured that he has been sued for an amount in excess of his policy limits, and, as well, the meaning and implications of that fact, see DR 1.4;
(2) To communicate to insured in a reasonable and timely fashion all of plaintiff's settlement offers, see Joos v. Drillock, 127 Mich. App. 99, 338 N.W.2d 736, 739-40 (1983); Joos v. Auto-Owners Insurance Company, 94 Mich. App. 419, 288 N.W.2d 443, 445 (1979); and DR 1.4; and
(3) Most important, where there is an opportunity to settle within the policy limits, and where the insured demands settlement within the policy limits, to move heaven and earth to effect such a settlement, see DRs 1.2(a) and 1.3; see also Thornton v. Breland, 441 So.2d 1348, 1350 (Miss. 1983), notwithstanding that the lawyer is being paid by the insurer. See DR 1.8(f); Mallen & Levitt, Legal Malpractice § 539 at 664-65 (2d ed. 1981); and Fulton v. Wofford, 26 Ariz. App. 17, 545 P.2d 979, *291 985-86 (1976). Coker's breach of this latter duty subjects him to liability here.
Here again the full measure of the lawyer's loyalty and fidelity must be to his client, Foster, the insured. See Lieberman v. Employer's Insurance Co. of Wausau, 84 N.J. at 339-40, 419 A.2d at 424-25. Because he did not timely limit the scope of his representation or loyalty, Coker is in precisely the same attitude toward Foster as if Foster had hired him and was paying his fee.
The obligations of the lawyer should not be confused with the duties of the insurance company, as outlined above. The two are separate, distinct and often quite different. As Foster's lawyer, on these facts Coker had the obligation to do everything reasonably possible to see that the case was settled within the policy limits. But he was not Hartford. He could not make Hartford settle. He could not settle without Hartford's authority. Hartford's duty to settle was only to make such settlements as may have been objectively reasonable.
The lawyer in Coker's circumstances may neglect and refuse to press the insurer, Hartford, to accept an offer to settle within the policy limits only with the informed consent of the insured, Foster, given after full and timely disclosure to the insured of all relevant facts and circumstances. See DRs 1.2(c), 1.4 and 1.7. Here no such disclosure was made to Foster. No consent was obtained. As the Sims v. Foster case was in trial when the settlement opportunities arose, the die regarding Coker's duties to Foster had been cast.
Notwithstanding, there are no doubt many cases where the insured's insurer-employed lawyer may resolve his conflict circumstance by withdrawing from representation of the insured. I refer here to circumstances where there remains time sufficient that the insured (or the insurer on behalf of the insured pursuant to the duty to defend) may take such steps as are necessary to secure employment of other counsel. See DR 1.16(d). In withdrawing, of course, the lawyer must act reasonably to protect the insured's interest, including giving the insured full and timely notice of all relevant facts and circumstances which at the very least includes notice of his rights that the insurer defend and make objectively reasonable settlements. These considerations, though noteworthy, would appear to have no application here, for the trial had already begun at the time Plaintiff Sims made his first settlement demand within the policy limits.
The majority makes a fundamental error. We are told Coker was in fact acting in Foster's interest when he sought from Hartford authority to pay up to $25,000 in settlement. This, we are told, "was to help Foster." (p. 41) The quick answer is that, however sincere Coker's motivations may have been, this was not the help Foster wanted. Foster wanted the case settled within the policy limits. Coker had no authority to ignore Foster's wishes. He had no authority to substitute his view of what may have been in Foster's best interest.
On reflection, the majority's reasoning simply won't wash. Coker didn't seek the $25,000 settlement authority to help Foster. Coker was surely savvy enough to see that Foster's only interest was settlement within the policy limits. Foster was indifferent to the amount of the settlement so long as it was less than $50,000. The majority's suggestion that Coker sought and obtained $25,000 settlement authority was "for the benefit of Foster ... was to help Foster" simply isn't so. Nothing in the record, nor in the common sense of the context, suggests otherwise.
The majority's point on causation is quite fanciful. The opinion reasons that Coker's failure to notify Foster of Sims' $30,000 settlement demand did not cause Foster damage. This is said to be so because there is no evidence Foster could or would have come up with "the difference [$5,000] out of his own pocket."
The point is off mark twice over. First, the breach of duty that gives rise to Coker's liability was not his failure to notify Foster of the settlement offer. Coker, as Foster's lawyer, had a duty on Foster's behalf to act with zeal to persuade Hartford to accept the $30,000 settlement. Breach of that duty is what, in my view, *292 generates Coker's liability. Second, Foster had no duty to make up the $5,000 difference. His insurance premiums had purchased the services of an attorney and Foster had every legitimate expectation that his attorney would move heaven and earth to get his insurer to come up with the $5,000 difference.
On September 12, 1977, Foster was Coker's client. This is so because Coker had failed to limit the scope of his representation of Foster, see DRs 1.2(a) and (c), and because there was not enough time as a practical matter to allow that other counsel be retained to protect Foster's interest, see DR 1.16(d). Because Foster was his client, our law imposes upon Coker a duty to Foster to take every step reasonably practicable to effect a settlement of the case at the $30,000 figure. The facts before us make it clear that Coker did nothing in discharge of this duty. The facts (construed as they must be favorably to the jury's verdict) further make it quite probable that, had Coker urged Hartford to do so, Hartford would in fact have been willing to pay $30,000 in settlement of the Sims suit prior to the $80,000 jury verdict. Under these circumstances, Coker breached his duty to his client, Foster, and that breach of duty was an independent and proximate cause of the $30,000 loss ultimately sustained by Foster. At least a rational trier of fact may reasonably have so found.
A postscript. I am told that my view is impractical, that insurance defense counsel can't live within the rules I would enforce. If Coker had pressed Hartford to settle as I view him duty bound to have done, Hartford would never refer him another case, or so the argument goes. Competition for the insurance defense dollar is keen. To be sure, the world is much with today's insurance defense counsel. Cf. Allison v. State, 436 So.2d 792, 793 (Miss. 1983). I would pirate the poet's pen and remind him that in getting and spending he lays waste his powers.
SULLIVAN, J., not participating.
DAN M. LEE, Presiding Justice, dissenting in part:
I join the today's majority opinion as to the non-liability of attorneys Coker and Williamson, discussed under the topics "Coker, Williamson and Hartford," "The Attorney's Duty," "Offer to Settle Conflict," and "What Happened Here," pages 23-43. I do not, however, agree with the majority's analysis as to the liability of Hartford, and for that reason join Justice Prather's dissent as to Part III, "Insurer's Duty." I further join Justice Prather's analysis of the punitive damages and prejudgment interest issues discussed under Parts VII and VIII of her dissent.
NOTES
[1] The policy had the following standard provision as to claims and lawsuits against an insured:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, for the purposes stated as applicable thereto in the declarations, of an owned automobile or of a temporary substitute automobile, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ..., even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, ... [Emphasis added]
[2] Robert E. Keeton, presently U.S. district judge in Boston, Mass., in 67 Harvard Law Review 1136, Liability Insurance and Responsibility for Settlement (1954), wrote an extensive article often cited in court opinions on this duty of liability insurance carriers to their insureds. He astutely observed the unusual conflict of interest problem by a failure to settle:

[T]he difficulty is that at the time decisions [as to whether or not to settle] must be made by the parties where there is uncertainty both as to whether company is guilty of a wrong in failing to settle and also as to whether any harm will result from such failure. Even if company is guilty of bad faith or negligence in refusing to settle, it is still possible that company's gamble will turn out favorably  that trial will result in a judgment against claimant or else for a sum smaller than the proposed settlement figure... . The problem, therefore, is not of mitigation of a loss certain to occur, but rather that one or the other party must choose (his choice affecting interests of both insured and company) between a certain but moderate loss on the one hand, and on the other hand a gamble which will result in a larger loss, a smaller loss, or no loss at all.
67 Harvard Law Review at 1162-1163.
[3] Two of our cases decided a half century ago also addressed this question. Farmer's Gin Co. v. St. Paul Mercury and Indemnity Co., 186 Miss. 747, 191 So. 415 (1939); Georgia Casualty Co. v. Cotton Mills Products, 159 Miss. 396, 132 So. 73 (1931). The evolving, modern holdings supersede some of the statements made therein, and to the extent that the holdings in those cases are contrary to this opinion they are overruled.
[4] We attach as Appendix I our views of the facts supporting Hartford's assessment.
[5] There is no experienced trial lawyer in small counties who does not value the opinion of a canny circuit clerk on his client's prospects before the jury. Anecdotally, lawyers tell of startling experiences of having a circuit clerk or deputy sheriff predict very close to the precise dollar sum of the final verdict. Of course, these court officials can occasionally be wrong, too.
[6] Rule 1.7 Conflict of Interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes:
(1) the representation will not adversely affect the relationship with the other client; and
(2) each client has given knowing and informed consent after consultation. The consultation shall include explanation of the implications of the adverse representation and the advantages and risks involved.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes:
(1) the representation will not be adversely affected; and
(2) the client has given knowing and informed consent after consultation. The consultation shall include explanation of the implications of the representation and the advantages and risks involved.
[7] RULE 1.2 Scope of Representation

* * * * * *
(c) A lawyer may limit the objectives of the representation if the client consents after consultation.
[8] Some for instances:

1. Even with the consent of them both, a lawyer obviously should not attempt to represent both sides of a lawsuit.
2. A, the insured has a liability policy which excludes punitive damages. He is in an accident in which a jury issue will probably be made on punitive damages, but the injuries to the plaintiff are minor. Should the defense attorney minimize the personal injuries, at the expense of a possible punitive damages award? In this kind of case, the defense counsel should carefully consider whether he could represent both the insured and the carrier.
3. Other instances: Schwartz v. SAR Corp., 19 Misc.2d 660, 195 N.Y.S.2d 496, 503 (1959), holding an attorney receiving information placing insured and carrier in a conflict of interest should withdraw; Allstate Ins. Co. v. Keller, 17 Ill. App.2d 44, 149 N.E.2d 482 (1958); Crum v. Anchor Cas. Co., 264 Minn. 378, 119 N.W.2d 703 (1963), the issue arose whether plaintiff was an employee and not covered by policy; Executive Aviation, Inc. v. National Ins. Underwriters, 16 Cal. App.3d 799, 94 Cal. Rptr. 347 (1971); see also, Mallen and Levitt, Legal Malpractice, (2nd Ed.), § 532, footnote 34, and cases cited, § 534, footnotes 41.5-47.
[9] As Appendix II we attach illustrative cases.
[10] In their 1977 edition, the same authors in § 263, p. 361, have the following sentences:

"Arguably, defense counsel should actively seek funds from the insurer to attempt to settle a case of serious liability which portends an excess exposure for the insured. But he will not be liable unless the insured proves that the insurer would have furnished the necessary monies." Citing Fulton v. Woodford, 26 Ariz. App. 17, 545 P.2d 979 (1976).
As we noted, this was not a case of serious liability. It was a case in which the attorneys and carrier, as well as the insured, had every reason to conclude nothing was owed the plaintiff.
[11] It manifestly was not the "solution" in this case. When the first offer of settlement was made the trial was about to begin. For Coker and Williamson to have withdrawn would have necessitated a continuance of the case. Gathered witnesses would have been disbanded. New trial counsel would have to be retained and start from scratch. Would the circuit judge have permitted these attorneys to withdraw? Even worse, to have withdrawn as counsel when the last offer was made would have necessitated a mistrial.
[12] Even though it may be to the insured's monetary advantage for the carrier to accept the offer, he still may want the company to reject it. By no means infrequently the insured, because of his outrage over being sued for what he considers a meritless claim, will not want the carrier to pay anything, even though it poses some risk to him. Cousins v. State Farm Mutual Auto. Ins. Co., supra, 294 So.2d 272, 277 (La. App. 1974). Here independent counsel might be helpful to an insured whose good judgment may be swayed by his emotion.
[13] To the same effect is the discrepancy existing between the attorneys for Sims and Coker as to whether Coker related to them Hartford's counter-offer of settlement of $25,000. Both of them testified they would promptly have rejected anything less than $30,000.
[1] According to new trends of thought in law, economics, and philosophy of the legal constructivists, reasonableness is a function of the conomic impact/costs of the settlement to the insurance company when compared and contrasted with the economic impact upon the insured of an excess judgment, discounted by the probability of its occurrence and the likely extent of such excess judgment if it does occur. Cf. Maryland Casualty Co. v. City of Jackson, 493 So.2d 955, 960, n. 3 (Miss. 1986). Bruce A. Ackerman, Reconstructing American Law, Harvard University Press.
[1] In this opinion I do not consider the question of Hartford's liability. On that score Justice Prather's opinion largely expresses my views on the law and the facts. In the end, I would affirm the judgment below in its entirety.
[2] Curtis E. Coker, Esq., of Jackson was legal counsel for the defense in Sims v. Foster. George G. Williamson, Esq., of Mendenhall served as local counsel. To the extent of his knowledge and participation, Williamson's legal and ethical posture is the same as Coker's.
[3] Representation regarding an insured's excess exposure includes having an advocate who will raise hell with the insurer to the end that the case be settled within the policy limits.